UNITED STATES of America,
Plaintiff-Appellant,

v.

TEXAS EDUCATION AGENCY (Lubbock Independent School District)
et al., Defendants-Appellees.

No. 78–2526.

United States Court of Appeals,
Fifth Circuit.

Aug. 9, 1979.

**520**

Jessica Dunsay Silver, Mark L. Gross, Asst. Attys. Gen., Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

D. Tom Johnson, Charles L. Cobb, Lubbock, Tex., for defendants-appellees.

Before GOLDBERG, CLARK, and RONEY, Circuit Judges.

CHARLES CLARK, Circuit Judge:

On August 19, 1970, the United States filed this action against the Lubbock, Texas, Independent School District (LISD) alleging that the Lubbock School Board had founded and maintained a segregated school system in violation of the fourteenth amendment. After allowing the parties to submit evidence, the district court ordered the School Board to integrate two of the District's all-black schools, Dunbar High School and Struggs Junior High School, by altering the attendance zones for those schools to encompass areas in which whites lived. Although the district court denied much of the relief the United States had requested, no appeal was taken. The district court retained jurisdiction over the suit.

No further judicial action of note occurred until the spring of 1977, at which time LISD applied to the district court for permission to go forward with its building construction program.[1] The United States

opposed LISD's motion and also filed a motion for supplemental relief, asserting that the 1970 order had failed to desegregate the Lubbock schools. In response to these motions, the district court held a lengthy evidentiary hearing at which both sides presented testimony and documentary exhibits. At the end of that hearing, the court entered an order requiring the desegregation of nine of the district's twenty-two minority schools[2] and permitting LISD to build new schools subject to the submission of a desegregation plan. The district court subsequently adopted a plan for the nine schools affected by its order. The United States appeals, asserting first, that the district court erred in holding that the racial composition of the minority schools not included in the desegregation order was not the product of School Board action, and second, that the desegregation plan adopted by the district court unfairly burdens minority students. We conclude that the case must be remanded to the district court for additional findings of fact.

I.

A.

Most of Lubbock's population (and consequently most of LISD's schools) is located in an elliptical area defined by a highway known as Loop 280. As is the case with many other cities, the racial distribution of the population has always been uneven. Up until the early 1950's, the black and Mexican-American populations of Lubbock were each located in discrete, compact areas in the northeastern and north central portions of the city near the schools to which their children were assigned. The white population lived in an area surrounding the minority sections.

Since 1950, Lubbock has experienced a large increase in population.[3] Much of this

---

1. The plan called for the construction of four elementary schools and a junior high school and for additions to various elementary schools.

2. The district court designated LISD schools having combined Mexican-American and black populations in excess of 70% as minority

schools. Without adjudication or adoption, we use the district court's terminology.

3. In 1950 the population of Lubbock was 71,-747. By 1960, the population grew to 128,691, and, in 1970, was 149,101. U. S. Bureau of the Census, 1970 Census of Population, Volume I, Part 45, Section 1, Table 7 (May 1973).

influx has been whites who located in the southwestern portion of the city. Additional development in the same area can be attributed to white families moving from the northeastern sections of the city. The minority population has also increased substantially, with the new and immigrating minority residents moving into the areas in the northeast and north central sections vacated by whites.

Today, the bulk of the white population of Lubbock lives in the southwestern and south central areas of the city. The minority population is contained in a corridor running from the north central to southeastern portion. Except for a boundary layer between the racially identifiable sections of the city, little intermingling is found.

The racial composition of LISD's schools mirrors the city's housing patterns.[4] When the government petitioned the district court for supplemental relief in 1977, LISD enrolled 32,313 students in fifty-three schools. 59.4% of the students were white, 27.3% were Mexican-American, and 12.6% were black. In the 1977–78 school year, twenty-three of LISD's schools had white enrollments exceeding 70%; twenty-two had minority populations exceeding 70%.

In reaching its decision on the merits of the government's motion for supplemental relief, the district court concluded that its task was to discover whether the racial composition of LISD's twenty-two minority schools was the product of School Board action. The court began its analysis by noting that LISD had, during much of its history, maintained a school system in which segregation was required by law. At the time of the decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), blacks living in LISD were required to attend the Dunbar Schools, which were located in the northeastern portion of the city. The School Board also had a policy requiring separate schools for Mexican-Americans, who were required to attend a school located in the north central section of Lubbock, the Guadalupe School (formerly known as the "Mexican School"). With the advent of *Brown* and a federal district court decision declaring segregation of Mexican-American school children unconstitutional,[5] LISD moved to end its *de jure* segregation. Instead of basing attendance assignments on a pupil's race, the district adopted a policy of assigning children to the schools nearest their homes.

■ Based on the history of *de jure* segregation and on the number of minority schools which still remained in LISD, the district court concluded that the United States had established a prima facie case of substantial intentional racial segregation under the principles established in *Keyes v. School Dist. No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Under *Keyes,* proof of intentional segregation in a substantial portion of a district's schools raises a presumption that segregation existing in the remainder of the district's schools is also the product of School Board action. 413 U.S. at 208, 93 S.Ct. at 2697, 37 L.Ed.2d at 563. In such a case, the burden shifts to the school district to show, by a preponderance of the evidence, that segregation at those schools was not caused by the School Board's intentional actions. *Id.*

In applying the principles announced in *Keyes,* the district court examined each of the twenty-two minority schools in LISD to determine whether the School Board had borne its burden to show a lack of intentional segregation. The court found that the minority status of the Guadalupe Elementary School and of the all-black schools built on or near the site of the old Dunbar Schools (Dunbar High School, Struggs Junior High School, and Iles and Wheatley Elementary Schools) was the result of School Board action. It found that even after *de jure* segregation ended, the School Board gerrymandered the attendance zones for these schools to retain their minority population.

---

4. Two tables showing the racial composition of the LISD schools for the 1977–1978 and 1978–1979 school years are printed as appendices to this opinion.

5. *Delgado v. Bastrop Independent School District, No. 388* (W.D.Tex. June 15, 1948).

The court next considered three minority elementary schools located in the northeastern section of the city, Posey, Bozeman, and Martin. Although the three attendance zones for the three schools are contiguous, their racial composition has varied. Posey and Bozeman opened in 1949 and 1951, respectively, as white schools, while Martin began operations in 1961 with a minority population in excess of 87%. In mid-1950's Posey began to experience increases in its minority population until it was, in 1977, 99% minority. Bozeman, during the mid-1960's, experienced a similar change in population; in 1977 Bozeman was over 95% minority.

The court noted that the School Board increased the capacity of Bozeman during the early 1960's. This increase was followed by an expansion of capacity at Posey and later at Martin, which was, according to the district court, not justified by enrollment figures. The court found that the increase in capacity at Bozeman was unnecessary since Bozeman's attendance zone could have been altered to shift the excess white student population to Martin and Posey, which were under-capacity at the time. The court held that the School Board decided not to alter the attendance zone because of its desire to forestall the integration of Posey and Martin. In addition, the School Board had, in the 1962-63 and 1963-64 school years, maintained two optional attendance zones between Bozeman and Martin and Posey, thus, in the district court's view, furthering the segregated status of the schools by allowing whites to attend Bozeman and minorities to attend Posey and Martin. In 1962, when it was evident that Bozeman was becoming a minority school, the School Board altered the attendance zone for Bozeman to move much of Bozeman's white population to Parkway Elementary, a nearby all-white school. The district court found that the School Board took this action in order to contain the minority population within the Bozeman-Posey-Martin attendance zones.

Finding that the School Board had acted to cause the minority status of Martin and Posey, the district court ordered that those schools be desegregated. The court, however, excluded Bozeman from that order, holding that Bozeman had, from 1965-1967, been a fully integrated school and that its subsequent resegregation was due to population shifts rather than to School Board action.

In 1951, the North Avenue U Elementary School (now known as the Mahon Elementary School) opened in a predominantly Mexican-American neighborhood, containing a minority population in excess of 70%. The district court found that the School Board had, at some point in the school's history, maintained racial segregation at North Avenue U by increasing the capacity at a nearby overcrowded white school rather than shifting part of that school's white population to North Avenue U. The court held that this action was taken with segregative intent and had contributed to North Avenue U's continuing minority status. North Avenue U Elementary was included in the district court's desegregation order.

Sanders Elementary is a predominantly Mexican-American school in close proximity to the Guadalupe School. When LISD was required to end the *de jure* racial segregation at Guadalupe, it assigned one-third of the Guadalupe attendance zone to Sanders. The district court found that the attendance boundaries for Sanders were soon again redrawn to transfer its white population to nearby Arnett and Posey. Holding that this action helped to perpetuate Sanders as a minority school, the district court included Sanders in its desegregation order.

The district court's order next focused on the remaining minority schools in the district—Hunt, Tubbs, McWhorter, Wolfarth, Southeast, Parkway, Jackson, and Harwell Elementary Schools; Alderson, Thompson, and Matthews Junior High Schools; and Estacado High School. These schools are all located in the boundary layer surrounding the areas in which the original *de jure* all-minority schools were built. The court found that the School Board selected the sites and drew the attendance zones for these schools in a non-discriminatory man-

ner, even though in the 1977–78 school year these schools had minority populations in excess of 70%. Noting that each of these schools had opened with substantial white populations and had, for short periods of time, become .fully integrated, the court held that the change in the racial composition of these schools was caused by a shift in racial housing patterns not attributable to School Board action.

The district court also examined the merits of the government's allegations that certain other School Board acts had contributed to the segregation in LISD. The court rejected the government's suggestion that the School Board had acted with segregative intent in closing three older elementary schools (Hunt,[6] Carter, ·and Thompson), finding that the closings had been prompted by factors other than the promotion of racial segregation. The court also found meritless the government's claims of segregative intent regarding site selection, minority-to-majority transfers, and faculty assignments.

### B.

Finding segregation present in nine of LISD's schools violated the fourteenth amendment, the district court ordered the School Board to submit a desegregation plan for those schools. The court adopted the plan submitted by the School Board, with minor modifications. That plan requires that minority students at the elementary schools found illegally segregated be transferred to a white school for three non-consecutive years (grades 1, 3, 5 or 2, 4, 6), while students in white schools receiving the minority transfers will be assigned to a minority school for one semester of one year. The Board must also assign white students attending white schools which do not receive minority transfers to a minority school for one semester of each of two different grades. The plan requires the Board to close Struggs Junior High and to assign its students to other junior high schools. Dunbar High School will retain its

existing attendance zone, but will contain a magnet school program designed to attract whites. The plan also includes a majority-to-minority transfer option.

This plan was put into effect in the 1978–79 school year. Although the minority schools which were the subject of the court's order are now fully desegregated, LISD still has a large number of one-race schools. As of September 8, 1978, LISD operated fifty schools. Twelve of these schools had minority populations exceeding 70%; nineteen had white populations greater than 70%.

The district court also ruled that the School Board could build new schools when and where it desires to, "subject only to the submission of a satisfactory plan to desegregation of each school in the district which the court finds is now racially identifiable as a minority school and whose racially identifiable status was caused by the segregative intent and discriminatory acts of the LISD, and provided that such construction will not hinder the integration of other schools." Under the plan adopted by the district court, the school district agreed to require that any newly constructed schools participate in the desegregation plan.

### II.

The United States presents two discrete types of complaints regarding the scope of the fourteenth amendment violation found by the district court. The government asserts first that the district court misapplied the *Keyes* presumption and viewed too narrowly the effects of the intentionally segregative acts it found the School Board had committed. Second, the plaintiff contends that the district court incorrectly refused to find that certain specific acts of the School Board were taken with segregative intent. We will address each of these arguments in turn.

### A.

■ Both the United States and LISD accept the district court's conclusion that

---

**6.** In 1966, LISD opened the "new" Hunt Elementary School. That school is among the

thirteen minority schools unaffected by the district court's desegregation order.

the government established a sufficiently wide-ranging variety of discriminatory School Board acts to require application of the *Keyes* presumption that segregation present in all of the minority schools in the district was the result of intentional School Board action.[7] The parties disagree, however, on the question whether the School Board presented sufficient evidence to rebut that presumption with regard to the minority schools not included in the desegregation order. Asserting that the School Board did not overcome the presumption of system-wide discrimination, the government urges that we should remand the case to the district court for entry of a system-wide remedy. The government also argues, in the alternative, that, notwithstanding the *Keyes* presumption, the evidence presented in the hearing mandates the conclusion that the School Board's intentionally segregative acts affected the entire district and thus requires imposition of a system-wide remedy. LISD contends that the record supports the district court's findings in all respects.

■ The district court based its refusal to order the desegregation of the other thirteen minority schools in LISD upon its conclusion that the School Board had proven that the racial composition of these schools was caused by shifting housing patterns that were not the product of School Board action. This conclusion necessarily embodies a series of subordinate factual findings. For example, the district court must have found that the School Board did not gerrymander the attendance zones at these schools in order to perpetuate their minority status. The validity of the court's ultimate conclusion can be assessed on appeal only if we know what subordinate findings support it. *See Golf City, Inc. v. Wilson Sporting Goods Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977); *Humphrey v. Southwestern Portland Cement Co.*, 488 F.2d 691, 694 (5th Cir. 1974).

The subordinate findings that the district court made to buttress its ultimate holding were based on a two-step analysis. In determining whether the School Board had rebutted the presumption of segregative actions with regard to a particular minority school, the court examined first, whether the school in question had ever been fully integrated and, second, whether the School Board had taken any direct action which caused the subsequent resegregation of the school. If the first question was answered in the affirmative and the second was answered in the negative, the court concluded that the racial composition of the minority school in question was not the product of school board action, but was instead the result of shifting housing patterns. If the answer to the first was negative or the second was affirmative, the court determined that intentional segregation required the school to be desegregated.

The analysis applied by the district court correctly focuses on deciding whether the segregated condition of a particular minority school was directly attributable to segregative acts aimed at that school. It, however, fails to address an equally crucial inquiry—whether the segregative acts committed by LISD affected the shifts in racial housing patterns which occurred in Lubbock. This omission is nowhere more apparent than in the district court's discussion of Bozeman Elementary School. The district court found that the Lubbock School Board had acted with segregative intent in redrawing the Bozeman attendance zone, at a time when Bozeman was rapidly becoming a minority school, to place a substantial number of Bozeman's white students in a nearby allwhite elementary school. Noting that Bozeman had subsequently become integrated and that the School Board had taken no specific acts to cause its resegregation, the court held that Bozeman's current segregated condition was due to shifting housing patterns rather than to the School Board's prior intentionally segrega-

---

7. The Supreme Court has recently reaffirmed the principles embodied in *Keyes. Dayton Board of Education v. Brinkman (Dayton II)*, —— U.S. ——, ——, 99 S.Ct. 2971, 2980–81, 61 L.Ed.2d 720, 735 (1979); *Columbus Board of Education v. Penick*, —— U.S. ——, —— & n. 7, 99 S.Ct. 2941, 2946–47 & n. 7, 61 L.Ed.2d 666, 677 & n. 7. (1979).

tive acts. The district court's conclusion that the current segregated status of Bozeman is the result of changes in racial housing patterns is supported by the record, but the validity of the district court's decision to exclude Bozeman from its desegregation order depends upon whether the discriminatory manipulation of Bozeman's attendance zone affected those housing patterns. The analysis used by the district court does not answer that question.

■ The basic assumption underlying many of the district court's findings is that the segregated condition of many of Lubbock's schools presents no constitutional violation since it is the result of racially neutral neighborhood school assignment plans. If, however, the housing patterns which are the basis of that assignment plan are themselves the product of the School Board's intentional acts of discrimination, then a constitutional infirmity exists. As the Supreme Court stated in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554, 573 (1971),

> Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. . . .
>
> . . . "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.

*See Columbus Board of Education v. Penick*, —— U.S. ——, —— n.13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 681 (1979); *Keyes, supra*, 413 U.S. at 211–12, 93 S.Ct. at 2683, 37 L.Ed.2d at 564–65.

■ The district court's analysis views each school as an island. It reasons that if no segregative acts were specifically aimed at a particular school, then no violation occurred. To treat a school located in an urban area as an isolated unit free from the effects of acts taken with regard to other schools in the district is unrealistic and contrary to the policy underlying the progeny of *Brown*—that the effects of intentional segregation be eliminated "root and branch." *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716, 723 (1968). In *Keyes*, the Supreme Court noted that "common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions." 413 U.S. at 203, 93 S.Ct. at 2686, 2695, 37 L.Ed.2d at 560. The gerrymander of attendance zones and the building of schools of certain sizes at certain locations, against the historic backdrop of a *de jure* system of segregation of long standing, can have the effect of designating certain schools as minority schools and of marking the areas of the city in which those schools are located as minority areas. *Columbus, supra*, —— U.S. at ——, 99 S.Ct. at 2948–49, 61 L.Ed.2d at 679, *Keyes, supra*, 413 U.S. at 201–03, 93 S.Ct. at 2694, 37 L.Ed.2d at 559–60; *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554, 569 (1971).

■ When *Keyes* is applicable, a court must examine the effects of the School Board's intentionally segregative actions closely. Indeed, the thrust of the required presumption is that the violations have also contributed to the segregation found in the remainder of the district. *Keyes*, 413 U.S. at 211, 93 S.Ct. at 2699, 37 L.Ed.2d at 564. This is how the Court described the rebuttal process it required:

In *Swann*, we suggested that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention. 402 U.S. at 31–32, 91 S.Ct. at 1283–84. . . . We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for growth of further segregation. Thus, if respondent School Board cannot disprove segregative intent, it can rebut the prima facie case only by showing that its past segregative acts did not create or contribute to the current segregated condition of the core city schools.

*Keyes, supra,* 413 U.S. at 211, 93 S.Ct. at 2698–99, 37 L.Ed.2d at 564.

■ Assessing the effects of the intentional segregative acts here is complicated by an unusual fact situation. The district court found that the Lubbock School Board had committed intentional acts to contain the minority population in the original all-minority schools and to protect the surrounding schools from the encroachment of minorities. The record here shows that this containment policy failed. The surrounding schools are now also predominantly minority. This is exactly the opposite result to that the district court found the School Board intended. Finding that the Lubbock School Board had no "purpose to discriminate" with regard to these surrounding schools, the district court held that the current segregated condition of these schools presented no constitutional violation, *citing Washington v. Davis,* 426 U.S. 229, 96 S.Ct.

2040, 48 L.Ed.2d 597 (1976). *Davis* held that the disproportionate racial impact of a particular governmental act is, standing alone, insufficient to justify a finding of unconstitutional discrimination. A constitutional violation can be established only by proof that the government body involved acted with an intent to discriminate.

The district court's findings are subject to two differing interpretations. First, the findings can be read to say that, despite the segregated status of the surrounding schools, the School Board has taken no intentional action which caused this segregation. This holding would, if supported by the record, justify a finding of no constitutional violation. Second, the findings could be construed to mean that even if the current segregation of these schools was caused by the School Board's intentionally segregative acts, no remedy is required since the Board did not specifically intend to cause the minority status of these schools, thus holding that the unintended effects of intentionally segregative acts cannot form the basis of a constitutional violation. The Supreme Court has never explicitly addressed this second interpretation. Both *Davis* and its descendant, *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), dealt with the problems of determining whether specific acts were taken with discriminatory intent, not with whether, in order to present constitutional violations, the effects of those intentional acts must also be intended.

■ Three appellate resolutions are possible. First, we could hold that only the intended effects of intentionally discriminatory acts constitute fourteenth amendment violations.[8] Second, we could hold that only foreseeable discriminatory effects of the intentional acts present violations. *See Unit-*

---

8. In *Abrams v. United States,* 250 U.S. 616, 626–27, 40 S.Ct. 17, 21, 63 L.Ed. 1173, 1178–79 (1919), Justice Holmes wrote:

[W]hen words are used exactly, a deed is not done with intent to produce a consequence unless that consequence is the aim of the deed. It may be obvious to the actor, that the consequence will follow, and he may be liable even if he regrets it, but he does not do the act with intent to produce it unless the aim to produce it is the proximate motive of the specific act, although there may be some deeper motive behind.

*ed States v. Texas Education Agency (Austin Independent School District),* 564 F.2d 162 (5th Cir. 1977). Third, we could hold that any segregative effect caused by an intentionally segregative act violates the Constitution. We choose the third solution.

 A strict definition of intent may be desirable when imprisonment or other harsh punishment could result. But the object of school desegregation litigation is not to punish the School Board for its acts, rather the goal is to restore the victim of discriminatory conduct to the position they would have occupied in the absence of such conduct, *Columbus, supra,* ——— U.S. at ———, 99 S.Ct. at 2970, 61 L.Ed.2d at 718 (Rehnquist, J., dissenting); *see Milliken v. Bradley,* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745, 755 (1977); *Dayton Board of Education v. Brinkman (Dayton I),* 433 U.S. 406, 419, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851, 862 (1977). Thus, if the Lubbock School Board's intentional segregative acts inadvertently contributed to the segregated condition of the schools surrounding the old *de jure* minority schools, a constitutional violation has occurred.

The analysis developed by the district court also concerned the temporary integration of the minority schools unaffected by the desegregation order. Most of these schools opened in the northeastern section of Lubbock with substantial white populations. When whites began to move from the northeast to the southwestern portion of the city, the white population of these schools steadily decreased. For a short period of time during this transition period, the student population of these schools was racially balanced. When the white exodus was completed, however, these schools were again racially identifiable. Then and still today they are virtually all-minority schools.

 The temporary integration of these schools is irrelevant to the assessment of effects of the School Board's intentionally segregative acts. If the housing patterns which cause the current segregation of the schools in question are not, at least in part, the product of intentional segregative ac-

tion, then no constitutional violation would have occurred even if these schools had never been integrated. *Pasadena Board of Education v. Spangler,* 427 U.S. 424, 434, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599, 607 (1976). On the other hand, if the intentional segregative acts helped establish the housing patterns, then the segregated status of these schools must be found to violate the constitution, despite their brief periods of integration. *See Columbus, supra,* ——— U.S. at ——— n. 13, 99 S.Ct. at 2950 n. 13, 61 L.Ed.2d at 681 n. 13; *Keyes, supra,* 413 U.S. at 211, 93 S.Ct. at 2698–99, 37 L.Ed.2d at 564.

 Other than the conclusory statement that no violation had occurred at the minority schools unaffected by the order, the district court made no specific findings on the effects on the schools and on Lubbock's housing patterns of the intentional segregative acts it found the School Board had committed. Without these subordinate findings, we cannot meaningfully review the district court's ultimate conclusion. Determining the effects of intentional discriminatory acts is a task committed to the district court. *Dayton I, supra,* 433 U.S. at 419, 97 S.Ct. at 2775, 53 L.Ed.2d at 862. Thus, in this situation, it is appropriate to remand the case to the district court for further findings of fact. *See Dayton I, supra,* 433 U.S. at 421, 97 S.Ct. at 2766, 53 L.Ed.2d at 864; *United States v. Texas Education Agency (Austin Independent School District),* 564 F.2d 162, 174–75 (5th Cir. 1977).

The district court's task on remand is to determine how much "incremental segregative effect" the School Board's intentional discriminatory acts had on the residential distribution of the Lubbock school population as presently constituted, when that distribution is compared to what it would have been in the absence of such intentional segregative acts. *Dayton I, supra,* 433 U.S. at 420, 97 S.Ct. at 2775, 53 L.Ed.2d at 863. In making specific findings concerning the effects, if any, of the intentional discriminatory acts on Lubbock housing patterns, the district court should also specifically find:

(1) whether it is significant that the minority schools unaffected by the order are in close proximity to schools at which intentional segregation was found, and (2) whether the location of the schools in question in areas near the original *de jure* segregated schools indicate that such segregation contributed to the current segregative condition. On remand, the School Board continues to bear the burden to show that its intentional segregative acts did not contribute to the current segregation of those schools.

### B.

Relying on another aspect of the *Keyes* presumption, the government urges that the proof it presented mandated a presumption that certain acts causing segregation at the schools unaffected by the order were committed with an intent to discriminate. It also contends that the School Board failed to present sufficient evidence to rebut that presumption. The district court examined some of the School Board acts that were the subject of the government's allegations, and held that the School Board's rebuttal evidence had overcome the presumption. The district court's order, however, does not explicitly address other acts which were the subject of the government's remaining contentions.

 Before turning to the merits of the government's assertions, it is appropriate to examine briefly the methods for proving that school district acts were committed with an intent to discriminate. In *Davis* and *Arlington Heights*, the Supreme Court held that disproportionate racial impact is not the "sole touchstone of an invidious racial discrimination" forbidden by the Constitution; some purpose to discriminate must be proven before a constitutional violation ensues. *Arlington Heights, supra,* 429 U.S. at 265, 97 S.Ct. at 563, 50 L.Ed.2d at 464; *Davis, supra,* 426 U.S. at 242, 96 S.Ct. at 2049, 48 L.Ed.2d at 609. Disproportionate impact is, however, not irrelevant to determining whether a governmental entity has acted with an intent to discriminate. It is among the factors in the calculus. *Co-*

*lumbus, supra,* —— U.S. at ——, 99 S.Ct. at 2950, 61 L.Ed.2d at 681; *Dayton Board of Education v. Brinkman (Dayton II),* —— U.S. ——, —— n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 732 n. 9. Moreover, "[i]f the impact of a governmental act can] not be plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law [is] in fact not neutral." *Personnel Administrator v. Feeney,* —— U.S. ——, ——, 99 S.Ct. 2282, 2294, 60 L.Ed.2d 870 (1979). If the impact can be explained on a racially neutral basis, then the court must rely on other considerations to determine whether purposeful discrimination is at work. Among those considerations is the historical background of the act—"particularly if it reveals a series of official actions taken for invidious purposes," the sequence of events leading up to the challenged act, the administrative history of the act, and any testimony from members of the governmental body committing the act. *Arlington Heights, supra,* 429 U.S. at 267, 97 S.Ct. at 564–65, 50 L.Ed.2d at 466.

 In *United States v. Texas Education Agency (Austin Independent School District),* 564 F.2d 162 (5th Cir. 1977), we followed the guidelines set down in *Davis* and *Arlington Heights* in developing a two-pronged analysis for dealing with the question of discriminatory intent. If the acts alleged to be violative of the Constitution "have been motivated by racially and ethnically bona fide concerns . . . and no showing is made that those concerns were actually subordinate to, or a subterfuge for, unconstitutional discrimination," then the fact that a particular act has a natural, foreseeable disproportionate racial impact is insufficient to support a finding of discriminatory intent. 564 F.2d at 168. *See Dayton II, supra,* —— U.S. at —— n.9, 99 S.Ct. 2982; *Columbus, supra,* —— U.S. at ——, 99 S.Ct. 2950, 61 L.Ed.2d at 681; *Feeney, supra,* —— U.S. at ——, 99 S.Ct. at 2282, 60 L.Ed.2d at 870. If, on the other hand, the challenged acts "do not have a firm basis in well accepted and historically sound non-discriminatory social policy, dis-

criminatory intent may be inferred from the fact that those acts had foreseeable discriminatory consequences." 564 F.2d at 168.

The government contends that the School Board committed various intentionally discriminatory acts which contributed to the segregated condition of Thompson and Matthews Junior High Schools and Southeast Elementary School. Alleging that the School Board intentionally selected the site and drew the attendance zones for Alderson Junior High School in order to isolate Mexican-Americans in Thompson Junior High, plaintiff urges that Thompson should have been included in the district court's desegregation order. With regard to Matthews, the government asserts that the School Board gerrymandered attendance zones and adjusted school capacities in order to retain Matthews' status as a minority school. The government argues that Southeast Elementary became a minority school because the School Board committed various discriminatory acts, including use of optional zones, manipulations of bus routes, and adjustment of school capacities.

In examining the government's contentions regarding Matthews, Thompson, and Southeast, the district court held that the current segregation of these schools was not the product of School Board action since the schools were at one time fully integrated and their subsequent resegregation was due to a change in housing patterns. We have held that this approach is insufficient to dispose of the issues in this case. On remand, the district court should make specific findings on the issues (1) whether, under the test established in *Austin*, the School Board committed acts with an intent to segregate Thompson, Matthews and Southeast, and (2), if it determines that the acts are intentionally discriminatory, whether the acts have contributed to the current segregation of these schools or to the establishment of segregated housing patterns in Lubbock.[9]

The government also asserts that the School Board operated several optional attendance zones between schools with racially disparate populations for the purpose of furthering segregation. From 1966 to 1971, the Board established an optional zone which permitted students to attend Alderson Junior High, or Struggs Junior High, or Dunbar High. The government contends that this zone was maintained in order to encourage blacks in that zone to attend Struggs or Dunbar. The district court made no findings concerning this optional zone. In view of the district court's decision to order the desegregation of Struggs and Dunbar, we need not consider whether maintenance of the optional attendance zone would also have mandated desegregation of these schools. The district court examined the remaining optional zones challenged by the government and concluded that the zones were initiated because of bona fide, non-racial concerns. This finding of fact is not clearly erroneous.

Noting that most of the schools built by LISD since 1954 have opened predominantly white or predominantly minority, the government next alleges that the district court erred in concluding that the School Board had not manipulated its construction and site selection programs to encourage segregation in the district. The district court concluded that the sites for the buildings had been chosen in a racially neutral fashion. This finding is not clearly erroneous. We note, however, that if the district court concludes, on remand, that discriminatory School Board acts have affected the housing patterns in Lubbock, then use of those housing patterns as a basis for construction plans without considering alternatives that would achieve optimal desegregation would violate the Constitution. *See Columbus, supra*, —— U.S. at ——, 99 S.Ct. at 2941, 61 L.Ed.2d at

---

9. Southeast Elementary has been closed since the district court entered its desegregation order. Despite the closing of Southeast, it is necessary to include Southeast in our instructions on remand since any discriminatory acts that the school district committed with regard to Southeast may have had an effect on the City's housing patterns and on the surrounding schools.

666; *Lee v. Autauga County Board of Education,* 514 F.2d 646, 648 (5th Cir. 1975); *United States v. Hendry County School District,* 504 F.2d 550, 554 (5th Cir. 1974).

The remaining arguments raised by the government concern the minority-to-majority transfer policy and faculty segregation. From 1955 through 1966, the Board had in effect a policy of allowing a student assigned to a school at which his race was in the minority to a school where his race was in the majority. The district court held that this policy had no effect on the racial composition of schools in the LISD since it had not been shown that anyone ever obtained a transfer under the policy. Examining the government's allegations concerning faculty segregation, the district court held that the Lubbock faculty assignment scheme complied with the guidelines established in *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir. 1969), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970). The

district court's findings on these matters are not clearly erroneous.

### III.

The government argues that the remedy granted by the district court unfairly burdens minority students and fails to remedy the effects of past intentional segregation. Since we have decided to remand this case for further findings of fact, we pretermit consideration of the correctness of the remedy ordered. That remedy should be left in effect until the district court can make the findings required by this opinion. If, on remand, the district court alters its holdings regarding the scope of the constitutional violation, it must adjust the remedy to the violations it finds under the principles set down in *Dayton Board of Education v. Brinkman (Dayton I),* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), and *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

REMANDED.

## APPENDIX A

ETHNIC BREAKDOWN OF ENROLLMENT, OCTOBER 1977

| SCHOOL | TOTAL ENROLL. | WHITE ENROLL. | PERCENT | MEXICAN–AMERICAN ENROLL. | PERCENT | BLACK ENROLL. | PERCENT | OTHERS ENROLL. | PERCENT |
|---|---|---|---|---|---|---|---|---|---|
| Arnett | 267 | 90 | 33.71 | 176 | 65.92 | 1 | .37 | – | – |
| Bayless | 1007 | 906 | 89.97 | 86 | 8.54 | 7 | .70 | 8 | .79 |
| Bean | 547 | 180 | 32.91 | 353 | 64.53 | 14 | 2.56 | – | – |
| Bowie | 482 | 455 | 94.39 | 23 | 4.77 | 2 | .42 | 2 | .42 |
| Bozeman | 597 | 24 | 4.02 | 272 | 45.56 | 301 | 50.42 | – | – |
| Brown | 362 | 261 | 72.10 | 94 | 25.96 | 6 | 1.66 | 1 | .28 |
| Dupre | 294 | 181 | 61.57 | 100 | 34.01 | 5 | 1.70 | 8 | 2.72 |
| Guadalupe | 157 | 19 | 12.10 | 130 | 82.80 | 8 | 5.10 | – | – |
| Hardwick | 696 | 624 | 89.66 | 36 | 5.17 | 19 | 2.73 | 17 | 2.44 |
| Harwell | 503 | 77 | 15.31 | 418 | 83.10 | 7 | 1.39 | 1 | .20 |
| Haynes | 560 | 545 | 97.32 | 11 | 1.96 | – | – | 4 | .72 |
| Hodges | 589 | 356 | 60.44 | 204 | 34.64 | 24 | 4.07 | 5 | .85 |
| Hunt | 258 | 12 | 4.65 | 79 | 30.62 | 167 | 64.73 | – | – |
| Iles | 187 | 1 | .54 | 5 | 2.67 | 181 | 96.79 | – | – |
| Jackson | 436 | 63 | 14.45 | 356 | 81.65 | 17 | 3.90 | – | – |
| McWhorter | 635 | 35 | 5.51 | 590 | 92.91 | 10 | 1.58 | – | – |
| Maedgen | 464 | 447 | 96.34 | 13 | 2.80 | 4 | .86 | – | – |
| Mahon | 223 | 27 | 12.11 | 180 | 80.72 | 16 | 7.17 | – | – |
| Martin | 251 | 4 | 1.59 | 100 | 39.84 | 147 | 58.57 | – | – |
| Murfee | 715 | 690 | 96.50 | 9 | 1.26 | 7 | .98 | 9 | 1.26 |
| Overton | 378 | 328 | 86.77 | 33 | 8.73 | 12 | 3.18 | 5 | 1.32 |
| Parkway | 760 | 24 | 3.16 | 278 | 36.58 | 458 | 60.26 | – | – |
| Parsons | 1040 | 981 | 94.33 | 35 | 3.37 | 15 | 1.44 | 9 | .86 |
| Posey | 366 | 3 | .82 | 147 | 40.16 | 216 | 59.02 | – | – |
| Rush | 583 | 523 | 89.71 | 38 | 6.52 | 5 | .86 | 17 | 2.91 |
| Sanders | 143 | 12 | 8.39 | 85 | 59.44 | 46 | 32.17 | – | – |
| Southeast | 120 | 30 | 25.00 | 83 | 69.17 | 7 | 5.83 | – | – |
| Stewart | 526 | 490 | 93.16 | 28 | 5.32 | 4 | .73 | 4 | .76 |
| Stubbs | 372 | 316 | 84.95 | 48 | 12.90 | 2 | .54 | 6 | 1.61 |

| SCHOOL | TOTAL ENROLL. | WHITE ENROLL. | PERCENT | MEXICAN–AMERICAN ENROLL. | PERCENT | BLACK ENROLL. | PERCENT | OTHERS ENROLL. | PERCENT |
|---|---|---|---|---|---|---|---|---|---|
| Tubbs | 393 | 21 | 5.34 | 366 | 93.13 | 6 | 1.53 | -- | -- |
| Wester | 526 | 499 | 94.87 | 21 | 3.99 | 3 | .57 | 3 | .57 |
| Wheatley | 364 | 4 | 1.10 | 7 | 1.92 | 353 | 96.98 | -- | -- |
| Wheelock | 525 | 446 | 84.95 | 71 | 13.53 | 7 | 1.33 | 1 | .19 |
| Williams | 846 | 794 | 93.85 | 26 | 3.07 | 7 | .83 | 19 | 2.25 |
| Wilson | 308 | 245 | 79.55 | 32 | 10.39 | 28 | 9.09 | 3 | .97 |
| Wolffarth | 626 | 67 | 10.70 | 540 | 86.26 | 19 | 3.04 | -- | -- |
| Wright | 178 | 75 | 42.14 | 102 | 57.30 | 1 | .56 | -- | -- |
| Ballenger | 120 | 59 | 49.17 | 41 | 34.17 | 20 | 16.66 | -- | -- |
| Coronado | 2019 | 1914 | 94.80 | 79 | 3.91 | 18 | .89 | 8 | .40 |
| Dunbar | 506 | 60 | 11.86 | 143 | 28.26 | 302 | 59.68 | 1 | .20 |
| Estacado | 1204 | 95 | 7.89 | 428 | 35.55 | 681 | 56.56 | -- | -- |
| Lubbock | 1286 | 496 | 38.57 | 733 | 57.00 | 45 | 3.50 | 12 | .93 |
| Monterey | 2139 | 2068 | 96.68 | 52 | 2.43 | 10 | .47 | 9 | .42 |
| Alderson | 873 | 45 | 5.15 | 367 | 42.04 | 461 | 52.81 | -- | -- |
| Atkins | 946 | 811 | 85.73 | 99 | 10.47 | 25 | 2.64 | 11 | 1.16 |
| Evans | 1340 | 1297 | 96.79 | 19 | 1.42 | 9 | .67 | 15 | 1.12 |
| Hutchinson | 518 | 473 | 91.31 | 40 | 7.72 | 4 | .77 | 1 | .20 |
| Mackenzie | 912 | 832 | 91.23 | 55 | 6.03 | 15 | 1.64 | 10 | 1.10 |
| Matthews | 946 | 51 | 5.39 | 874 | 92.39 | 21 | 2.22 | -- | -- |
| Slaton | 649 | 288 | 44.38 | 267 | 41.14 | 94 | 14.48 | -- | -- |
| Struggs | 350 | 18 | 5.14 | 154 | 44.00 | 177 | 50.57 | 1 | .29 |
| Thompson | 307 | 52 | 16.94 | 211 | 68.73 | 40 | 13.03 | 4 | 1.30 |
| Wilson | 842 | 754 | 89.55 | 64 | 7.60 | 9 | 1.07 | 15 | 1.78 |
| New Direct. | 37 | 10 | 27.03 | 9 | 24.32 | 18 | 48.65 | -- | -- |
| Homebound | 21 | 15 | 71.43 | 4 | 19.05 | 2 | 9.52 | -- | -- |
| Project Int. | 14 | 8 | 57.14 | 1 | 7.14 | 5 | 35.72 | -- | -- |
| GRAND TOT. | 32313 | 19201 | 59.42 | 8815 | 27.28 | 4088 | 12.65 | 209 | .65 |

## APPENDIX B

### ETHNIC BREAKDOWN OF ENROLLMENT, SEPTEMBER 8, 1978