Jimmy ANDREWS et al., Plaintiffs,

United States of America, Plaintiff-Intervenor, Ada Blakes et al., Plaintiff-Intervenors,

v.

CITY OF MONROE et al., Defendants,

Lloyd Gill et al., Defendant-Intervenors.

and

Jeremiah TAYLOR et al., Plaintiffs,

v.

OUACHITA PARISH SCHOOL BOARD et al., Defendants.

Civ. A. Nos. 11297, 12171.

United States District Court,
W. D. Louisiana,
Monroe Division.

May 19, 1980.

4. April 4, 1980, is the date on which the trial of this case was concluded.

Daniel Jennings, David Birnbaum, U. S. Dept. of Justice, Washington, D. C., for U. S. A. plaintiff-intervenor.

Charles D. Jones, Ben Jones, Jones & Jones, Monroe, La., for Ada Blakes, et al., plaintiffs-intervenors:

Paul Kidd, Monroe, La., for Monroe City School Bd.

James Sparks Jr., Monroe, La., for Lloyd Gill, et al., defendants-intervenors:

Stephen J. Katz, Rankin, Yeldell, Herring & Katz, Bastrop, La., for plaintiffs in 12171.

Robert P. McLeod, David E. Verlander, III, Monroe, La., for Ouachita Parish School Bd.

## OPINION

STAGG, District Judge.

These consolidated school desegregation suits are currently before the court on the Government's motion for further relief, seeking intradistrict and interdistrict remedies and on defendant intervenors' motion to be relieved from the current desegregation plan operating in the Monroe City School System. In 1979, the student population of the City system was 72.7 per cent black, and student population of the Parish system was 77.5 per cent white.[1] At trial, Monroe City conceded, and this court finds that further intradistrict relief is required in the Monroe City system. Accordingly, the motion of defendant-intervenors Lloyd Gill, et al., is GRANTED. After a three-day trial on the merits and several months to consider the post-trial briefs and voluminous exhibits filed in this matter, this court must conclude that the Government has proven the existence of a limited constitutional violation producing a significant segregative effect in another district. *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

The scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The limited violation found by this court is the geographic overlap of two traditionally dual school systems. This overlap perpetuates vestiges of the segregated system and must be dissolved. *Wright v. Council of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) and *United States v. Scotland Neck Board of Education*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). Accord-ingly, the overlapping student attendance zones of the two systems must be abolished. However, the Government's allegation that the two systems were not separate and independent was totally refuted at trial. Consequently, the interdistrict remedy of consolidation would exceed the scope of the proven constitutional violation, and is DENIED.

In Louisiana, two school systems serving one parish is anomolous and anachronistic; however, they are a political reality that a recent Supreme Court authority allows to stand. *See Milliken v. Bradley, supra.* A decision to alter the function of these two political entities must be effectuated by a legislative decision, not a judicial one.

## II.

Ouachita Parish is located in Northeast Louisiana. The majority of the parish's population is centered in the Monroe-West Monroe urban area. The parish is divided into four quadrants by natural boundaries: the Ouachita River runs north-south, dividing the parish into east-west sections; Interstate Highway 20 runs east-west, dividing the parish into north-south sections.[2]

The City of Monroe is located in the approximate geographic center of the parish with the Ouachita River serving as the western boundary of the city. The river separates the City of Monroe from the City of West Monroe.[3] The Monroe City School System (hereinafter referred to as "MCSS") operates its own schools within Ouachita Parish, Louisiana. The Ouachita Parish School System (hereinafter referred to as "OPSS") serves the entire parish, including the City of Monroe. Consequently, a student residing within the Monroe city limits is physically located in two school systems and their respective attendance zones.[4] Before discussing the merits of the case, a

---

1. *See* Appendices II and IV attached to this opinion.

2. *Taylor v. Ouachita Parish School Board*, 424 F.2d 324 (5th Cir. 1970).

3. *See* Government Exhibit 43. Hereinafter, the numbered exhibits shall be referred to in the following manner: Government exhibits as GX; Ouachita Parish School Board exhibits as PX; Monroe City School Board exhibits as CX.

4. CX 17, 18 and 19.

brief review of the separate histories of these consolidated desegregation suits will be helpful.

## A.

On August 5, 1965, Jimmy Andrews and Tommy Ray Robertson, minor children enrolled in the MCSS, sued through their mothers, Ms. Etta Mae Andrews and Ms. Odell Willis, alleging racial segregation and discrimination in the operation of the Monroe City public schools. *Jimmy Andrews v. City of Monroe*, Civil Action No. 11,297. The named plaintiffs sought to represent a class composed of all black parents and students domiciled in the City of Monroe. This litigation has had a protracted history which mirrors the major decisions of the Supreme Court and the United States Court of Appeals for the Fifth Circuit in school desegregation law.

On September 17, 1965, this court (Dawkins, J.) signed a permanent injunction prohibiting the defendants from "continuing to operate a compulsory bi-racial school system." After further district and appellate court action, the court entered a decree containing the "freeze order" which became a focal part of this litigation.[5] Later, shortly after signing another decree on February 11, 1970, the court allowed the United States to appear as *amicus curiae* "with the right to submit pleadings, evidence, arguments and briefs, the right to move for injunctive and other necessary and proper relief, and the right to initiate such further proceedings that may be necessary and appropriate."

On February 24, 1970, the case came on for hearing on defendant School Board's motion for supplemental relief. This court entered a written decree vacating its previous order of February 11, 1970, and adopting the plan previously submitted by the School Board.[6] This neighborhood plan was overturned by the United States Court of Appeals for the Fifth Circuit, as it failed to establish a unitary system. On August 5, 1970, this court entered a decree in accordance with the Fifth Circuit mandate. This decree was later affirmed by the Fifth Circuit.

After further litigation and an appeal, a consent decree was approved on July 30, 1971.[7] This decree allowed a neighborhood school plan and established a Bi-racial Committee. Subsequent activity in this case included an adjudication on June 13, 1973, that defendant School Board was in contempt for failure to adhere to the 1971 consent decree. However, finding mitigating circumstances and that "the Board is not wilfully and deliberately attempting to evade the orders of this court ... nor wilfully attempting to perpetuate a dual school system in the City of Monroe," this court (Putnam, J.) refused to order sanctions.

On July 27, 1973, the defendant School Board moved for further relief under the July 30, 1971 consent decree. After a hearing, a consent judgment was entered on August 16, 1973.[8] This decree established attendance zones for all schools and grades within the City system. To desegregate the junior high and high schools, the decree implemented a curious change rule that turned students in certain zones into "Mexican jumping beans". In some cases, a student would be required to change schools five times between the seventh and twelfth grades.[9] This decree specifically incorpo-

---

5. The terms of the "freeze order" are discussed *infra*. It was entered on August 1, 1969.

6. GX 3. Paragraph 3 of this decree stated that:

  The previous order of this Court with regard to "freezing" students as between the Monroe City School system and the Ouachita Parish School system shall remain in full force and effect.

  This statement was in reference to the court's order of August 1, 1969.

7. GX 4.

8. GX 2. This decree was amended on August 30, 1973. Paragraph 10 was added covering extra-curricular activities at the area high schools.

9. The August 19, 1973 order provided, in part:

  A motion for further relief and rule to show cause having been filed herein by defendant, Monroe City School Board, seeking to amend the previous judgments rendered herein, and

rated all prior court decrees not inconsistent with its present terms and is in effect today.[10]

There was no further activity of any moment in this case until August 3, 1977, when Lloyd Gill and nine other white parents moved to intervene on behalf of their minor children. The intervenors attacked the validity of the 1973 plan, alleging that it was educationally unsound and causing an exodus of white students from the MCSS. On November 9, 1977, this intervention was allowed, and the matter was scheduled for trial. On May 11, 1978, the United States was allowed to intervene in the case as plaintiff. On June 20, 1978, the court allowed Ada Maria Blakes, through her father Alfred Blakes, as well as other named black parents with children in the MCSS, to intervene as party plaintiffs.

In its response of July 21, 1978, the United States agreed with the Gill intervenors that the current desegregation plan in operation in Monroe City should be reexamined. The Government complained that the plan

had resulted in several predominantly black schools. At this time, the Government also played the first card leading to the present litigation: "In addition, apparently contributing toward the racial impaction in the Monroe City Schools, is the large number of Monroe City residents attending schools in Ouachita Parish." Although this interdistrict attendance was authorized by previous orders of this court, the Government complained that this interdistrict attendance had retarded desegregation in both school systems.

Following the Government's lead, on August 21, 1978, counsel for the defendant Monroe City School Board played what he doubtless considered the City's remaining trump card—a motion to consolidate this action (11,297) with *Taylor v. Ouachita Parish School Board*, Civil Action No. 12,171. This action is not surprising. As the figures in Appendix VI clearly show, the MCSS went from 50.5 per cent white in 1965 to 27.3 per cent white in 1978–79. If the City could join with a system that was

particularly that certain Consent Decree rendered by Honorable Ben C. Dawkins, Jr., on July 30, 1971, and the parties hereto having jointly submitted to the Court a proposed Consent Decree, and after hearing testimony of the school administrators relative thereto, together with argument of counsel;

IT IS THEREFORE ORDERED:

(1) The students attending the Monroe City School System shall be assigned to schools as follows ...

\* \* \* \* \* \*

(c) All seventh grade students domiciled North of the Interstate 20 shall attend Carroll Junior High School, and all seventh grade students domiciled South of the Interstate 20 shall attend Jefferson Junior High School;

(d) All eighth grade students domiciled North of the Interstate 20 shall attend Lee Junior High School, and all eighth grade students domiciled South of the Interstate 20 shall attend Jefferson Junior High School;

(e) All ninth grade students domiciled North of the Interstate 20 shall attend Neville High School, and all ninth grade students domiciled South of the Interstate 20 shall attend Wossman High School;

(f) All tenth grade students domiciled North of the Interstate 20 shall attend Carroll High School, and all tenth grade students domiciled South of the Interstate 20 shall attend Wossman High School;

(g) All eleventh and twelfth grade students domiciled North of Louisville Avenue, as extended by the Missouri Pacific Railroad to the Eastern city limits, shall attend Neville High School; all eleventh and twelfth grade students domiciled South of Louisville Avenue as extended by the Missouri Pacific Railroad to the Eastern city limits and North of the Interstate 20 shall attend Carroll High School, and all eleventh and twelfth grade students domiciled South of the Interstate 20 shall attend Wossman High School.

The above provisions, in particular, were objected to by the Lloyd Gill intervenors.

10. Paragraph 3 of the August 1, 1969 order established the "freeze" order. The 1973 decree, in § 8, provided:

The previous decrees rendered herein are hereby maintained in all respects not inconsistent with this decree.

GX 2. The consent decree of February 24, 1970 stated, in Paragraph 3:

The previous order of this court with regard to "freezing" students as between the Monroe City system and the Ouachita Parish system shall remain in full force and effect.

GX 3. Paragraph 8 of the August 16, 1973 decree maintained the terms of all previous decrees not inconsistent with the current order. Consequently, the freeze order and its implementation has been carried forward to the present day.

77.5 per cent white, it could tap the student pool needed to stem this alarming white exodus.[11]

Later, the Government also moved to consolidate the Ouachita Parish desegregation suit with the Monroe City action. The Government sought consolidation or joinder to resolve alleged intradistrict and interdistrict constitutional violations of the Monroe City School Board and the Ouachita Parish School Board. The Government also petitioned the court for a "comprehensive desegregation plan providing both intradistrict and interdistrict relief so as to remove all vestiges of the dual school system in both school systems." Before discussing the court's ruling on this motion, the facts of the less litigious Ouachita Parish desegregation suit should be set forth.

### B.

On July 22, 1966, black parents with children in the Ouachita Parish public school system filed an action on behalf of themselves and all others similarly situated, seeking injunctive relief against the School Board from operating a compulsory bi-racial school system. *Jeremiah Taylor v. Ouachita Parish School Board*, Civil Action No. 12,171.[12] The course of this desegregation suit has been less tortuous than *Andrews v. City of Monroe.*

As in the *Andrews* case, this court (Dawkins, J.) held a hearing and entered a decree

permanently enjoining defendant from "continuing to operate a compulsory bi-racial school system in Ouachita Parish, Louisiana." A desegregation plan was signed on August 3, 1966. As in *Andrews*, the history of the Ouachita Parish litigation tracks the major changes in the school desegregation law. On August 1, 1969, a new plan was ordered and the "freeze order" granted. After various hearings and appeals, the case was again heard on January 28, 1970, and a decree entered. This decree was slightly modified by the Fifth Circuit on April 13, 1970.[13] Upon remand, the decree underwent several rapid modifications: On June 16, 1970, Booker T. Washington school was closed and converted to a vocational technical school[14]; on June 30, 1970, the zone lines effecting attendance at Richwood High School were changed; on July 9, 1970, the grade classifications at Richwood High School and Swartz Elementary School were altered.

On August 6, 1971, plaintiff filed a motion seeking further relief. The matter was heard before Judge Edwin F. Hunter Jr. on August 18, 1971. Judge Hunter issued a written opinion appointing a bi-racial committee and deferring any decision on the modification of the June 30 and July 19 consent decrees until a recommendation of the bi-racial committee was submitted. Apparently, the committee later recommended that the status quo be maintained with the exception of the first grade chil-

---

11. Such strategy is not novel. As Professor Bell stated in *Brown v. Board of Education and the Interest-Convergence Dilemma*, 93 Har.L. Rev. 518, 531–32 (1980):

> The educational benefits that have resulted from the mandatory assignment of black and white children to the same schools are also debatable. If benefits did exist, they have begun to dissipate as whites flee in alarming numbers from school districts ordered to implement mandatory reassignment plans. In response, civil rights lawyers sought to include entire metropolitan areas within mandatory reassignment plans in order to encompass mainly white suburban school districts where so many white parents sought sanctuary for their children.

(Footnotes omitted). At trial, City Superintendent, Dr. Sidney Seegers, testified that inter-

district relief would be in the best interest of the Monroe City School System because of the general decline in white students.

12. The original caption of this suit was *Donald Newton, et al., v. Ouachita Parish School Board, et al.* On August 3, 1966, the named plaintiff, Jeremiah Taylor, intervened. The suit came to bear his name.

13. *Taylor v. Ouachita Parish School Board*, 424 F.2d 324 (5th Cir. 1970).

14. Students formally attending Booker T. Washington were assigned to Ouachita Parish Junior High, Lakeshore Elementary and Jack Hayes.

dren who originally attended Booker T. Washington.[15]

There was no further action in this matter until additional party plaintiffs were joined in July of 1978. On August 15, 1978, the School Board moved for approval of new school construction. A hearing was held on August 22, 1978. The matter was taken under advisement, pending resolution of the government's motion for interdistrict relief in the present litigation.[16]

## C.

Pursuant to the Government's motion of November 16 to consolidate, as amended on January 2, 1979, this court ruled that *Taylor v. Ouachita Parish School Board* and *Andrews v. City of Monroe* be consolidated for "the limited purpose of the trial of the United States' motion for intra and interdistrict relief." The court declined to join the Ouachita Parish School Board as a party to the *Andrews* suit or to formally consolidate the two actions. On June 5, 1979, this court issued a ruling, pursuant to Rule 611(a) of the Federal Rules of Evidence, setting forth the order of procedure at trial. The court ruled that the trial would concern the allegations in the Government's Motion for Further Relief that the City and Parish authorities were guilty of constitutional violations, having an interdistrict effect. Further, the court would hear evidence that the present Monroe City desegregation plan was unacceptable and had failed to remove all vestiges of the dual systems. Finally, the Lloyd Gill intervenors would be allowed

to present evidence supporting their Motion for Further Relief. In footnote 2, the court ruled, "The propriety of intradistrict relief within the Ouachita Parish School System is not before the court." In addition to ruling on the presentation of evidence by the six separate parties to this lawsuit, the court also bifurcated the trial and stated: "If the United States establishes the existence of constitutional violations, the appropriate remedy will be determined through subsequent proceedings." On July 9, 10 and 11, 1979, evidence on all issues was presented.

## III.

From the trial of this matter, the court finds the following facts established by a preponderance of the evidence:

(1) Until 1957, the state law required that Louisiana public schools be operated on a segregated basis. La.Const. art. 12 § 1 (1932); La.R.S. 17:331–334, derived from Acts 1954 no. 555 §§ 1–4 (repealed 1957). Consequently, even after the Supreme Court decision in *Brown v. Board of Education of Topeka*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), Louisiana law required the segregation by race of its public school systems.

(2) At the time the original complaints were filed in the respective school desegregation suits—August 1965 in *Andrews v. City of Monroe* and July 1966 in *Taylor v. Ouachita Parish School Board*—the local school authorities operated a dual school

---

**15.** In this opinion, Judge Hunter stated:

There are four school zones. Zones 2, 3 and 4 comprising approximately three-fourths of the Parish are clearly unitary in every detail.

Later, he stated:

The Ouachita system, as approved by the Fifth Circuit, became a unitary system.

It is this court's opinion, considering Judge Hunter's abbreviated supervision of this case, that it was not his intention to declare the system unitary in the sense that the court no longer retained jurisdiction over the matter and in the sense that the system had attained a color blind status in pupil assignment. The Fifth Circuit has outlined the orderly procedures district courts are to follow in entering an order that a school system is, indeed, unitary. *See, e. g., United States v. State of Texas*

*(San Felipe Del Rio Consolidated Independent School District)*, 509 F.2d 192 (5th Cir. 1975); *Youngblood v. Board of Public Instruction of Bay County, Florida*, 448 F.2d 770 (5th Cir. 1971); *Steele v. Board of Public Instruction of Leon County, Florida*, 448 F.2d 767 (5th Cir. 1971). If it was Judge Hunter's intention to declare the Ouachita Parish system unitary, alleviating any further need for judicial intervention, this court sets this finding aside considering the number of one-race schools in the system and the posture of the present litigation.

**16.** The court will issue a ruling on the Parish's request for approval of school construction sites in a ruling separate from this opinion.

system with separate schools for black children and separate schools for white children.

(3) In 1977–78, 9,184 students attended Monroe City schools; 6,212 students were black—67.6 per cent.[17] Monroe had four schools that were 90 per cent or more one race: Berg Jones, Carver, Clark and Lincoln. In 1978–79, 9,168 students attended Monroe schools; 6,667, or 72.7 per cent, were black.[18] The Monroe City system has 18 schools, six of which were originally built for black students and 12 for white students.[19]

(4) In 1977–78, there were 18,754 students enrolled in the Parish system; of these students, 14,610, or 77.9 per cent, were white and 4,144, or 21 per cent, were black.[20] Ouachita Parish has 16 schools which are over 90 per cent or greater one race. In 1978–79, there were 18,730 students enrolled in the Parish system; 14,517 (77.5 per cent) were white and 4,313 (22.5 per cent) were black.[21] Currently, Ouachita Parish's school system has 32 schools, 26 of which were originally built for white students and 6 of which were originally built for black students.[22] Accordingly, it is clear from the facts and statistics introduced into evidence at trial that both the Monroe City School System and the Ouachita Parish School System are composed of predominantly one-race schools. Neither system has completely fulfilled its duty to remove all vestiges of the dual school system.

(5) Pursuant to La.Const. art. 8 § 10 (1974), two separate and politically autonomous public school systems are allowed to exist in Ouachita Parish.[23] Monroe City School Board serves the City of Monroe and its boundaries are co-terminus with the corporate limits of the City.[24] The Ouachita Parish School Board serves the entire parish of Ouachita, including the urban areas of Monroe and West Monroe.[25]

(6) The two systems have existed since at least 1920, and no party contends that the separate school systems were established for the purpose of racial segregation.[26] Nor does any party claim that the boundaries between the two systems have been drawn with a racial animus or that the two sepa-

17. *See* Appendix I. The total number of students in the Monroe system varies with the Government exhibit used. However, this court will use the figures in GX 48.

18. *See* Appendix II.

19. *See* Appendix V.

20. *See* Appendix III.

21. *See* Appendix IV.

22. *See* Appendix V.

23. La.Const. art. 8, § 10, provides:
    (A) Recognition. Parish and city school board systems in existence on the effective date of this constitution are recognized, subject to control and supervision by the State Board of Elementary and Secondary Education and the power of the legislature to enact laws affecting them.
    (B) Ouachita Parish and Monroe City School Systems; Board Membership. Only persons residing within the jurisdiction of the Monroe City School Board shall be eligible to vote for or be members of the Monroe City School Board. Only persons residing in that portion of Ouachita Parish outside the jurisdiction of the Monroe City School Board shall be eligible to vote for or be members of the Ouachita Parish School Board. The position of a member of either board shall be vacated when he no longer satisfies the requirements of this Paragraph. Notwithstanding any contrary provision of this constitution, this Paragraph shall become operative upon the election of members to the Ouachita Parish School Board taking office in 1977 or upon the first reapportionment affecting the Ouachita Parish School Board, whichever occurs earlier.
    (C) Consolidation. Subject to approval by a majority of the electors voting, in each system affected, in an election held for that purpose, any two or more school systems may be consolidated as provided by law. *See Armour v. Nix*, Civil Action No. 16,708 (N.D.Ga., filed March 1978) at n. 2, *aff'd*, 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 784 (1980). In *Armour*, Georgia had a state constitutional provision similar to the Louisiana provision.

24. GX 20 and 43.

25. GX 44–46; CX 14–16.

26. PX 6, Interrogatory No. 22.

rate systems have been maintained to perpetuate racial segregation.[27]

(7) MCSS and the OPSB are completely separate and autonomous. They have separate school boards and separate officials. They have no joint activities and no liaison office between the two systems. Except for a parish-wide sales tax shared by both systems, there exists no interlocking fiscal policy.[28]

(8) Before 1960, students were allowed to switch between the City and Parish systems at any time. After 1960, the change in systems could occur only at the beginning of a semester. This was later modified to allow a switch only at the beginning of each school year.[29] The court does not consider the effects of this option prior to the freeze order to be consequential, as both systems operate under a freedom of choice plan. No white student had to change schools to attend the school of his race. Whether this early switching would have had an effect on the residential patterns is doubtful, as both systems had a large population of white students. Regardless, the court did not hear evidence on this point.[30] Finally, Dr. Seegers testified at trial that few students changed systems during this period.

(9) On August 1, 1969, this court (Dawkins, J.) entered a decree in each of these consolidated desegregation suits. The decrees contained the following common language:

> The City of Monroe School Board and the Ouachita Parish School Board both operate schools within the city limits of Monroe, Louisiana. The pupils who have attended the *Ouachita Parish School System* [Monroe City School System] are "frozen" or must continue in the Parish [City] system during the year 1969–70 in a suitable grade. Once a new student has chosen to attend a school in a system, he may not change to another school in the City [Parish] system, unless he comes into for the first time, or moves into another area within [outside] the city limits. Any unforseen conflicts of a pupil's attendance may be resolved by the superintendents of the two systems and failing this can be submitted to the Court for decision.

\*   \*   \*   \*   \*   \*

> Sixth, this Court retains jurisdiction in this entire matter, including the "freeze" question mentioned hereinabove, and will issue orders and decrees as necessary; all prior orders concerning the filing of periodic reports by the School Board to the Court are continued in effect.

The text of this order entered in the Parish suit is almost identical to the language of the order entered in the City suit, with the bracketed language indicating the change in the underlined words.

The terms of this "freeze" order have been carried forward to the present day without change.[31] On its face, the "freeze" order and its concomitant option operate in a racially neutral manner. It is the implementation of this order by the respective School Boards that the Government alleges has caused interdistrict attendance patterns triggering interdistrict relief.[32]

---

27. PX 6, Interrogatories No. 23–24.

28. GX 69, Interrogatories No. 10, 17 and 18; *see also* Interrogatories No. 11, 18, 19 propounded by the United States to the City of Monroe. This fact was also substantiated by the trial testimony of the City Superintendent, Dr. Sidney Seegers.

GX 7, the Minutes of the City School Board meeting of September 18, 1973, does contain a reference to a motion by the City School Board to contact the Parish superintendent about the possibility of forming a joint committee to handle student transfers. No evidence in the record indicates that this motion was ever acted upon.

29. Trial testimony of Dr. Sidney Seegers.

30. The testimony of Ms. Pearce, the government's expert on this issue, was not allowed into evidence. *See* discussion *infra*.

31. *See* footnote 10, *supra*.

32. *See* the Government's motion of November 16, 1978, seeking consolidation of the cases or, in the alternative, joinder of parties and motions for intradistrict and interdistrict relief. *See also* PX 6, Interrogatory No. 4.

(10) In both systems, primary enforcers of this freeze order are the individual school principals. If the principal suspects a violation, he would contact the Child Welfare and Attendance Office.[33] Although there were minor variations in the interpretation of this freeze order as recounted by the principals and Child Welfare and Attendance officers, the option aspect of this order seemed to work as follows: A student could choose either system upon his initial entry into the Parish school systems. At that point, he would be "frozen" and attend the school in the chosen system serving his zone of residence. A person thus was free to choose the school system, but not the school. The student could then change school systems only after a bona fide change of residence which placed him physically across the geographic boundaries of the other system. For example, a City resident who opted to attend City schools could switch to the Parish system only if he moved out of the city limits into the Parish. Likewise, a Parish resident who opted to attend the Parish school in his neighborhood could switch to a City school only by a move to a residence inside the city limits of the City of Monroe.[34]

(11) There were no written guidelines regarding enforcement of the 1969 freeze order; however, at the beginning of each school year and at monthly administrative meetings, the superintendent of each system instructed his principals on the order's interpretation and enforcement.[35]

In OPSS, at the beginning of each school year, any student enrolling in the school for the first time, who was not a first grade student or a student from a feeder school, needed an affidavit showing change of residence. In the early 1970's, this affidavit had to be notarized, but this requirement was dropped in 1975 as superfluous.[36] This address would be placed on a student's enrollment card, and the principal would check the address to be sure the residence was within the proper zone and the proper system. Any suspicious addresses, as well as any problems in this area, would be referred to the Child Welfare and Attendance officer. The City used registration cards.[37] The principal was responsible for the validity of addresses and problems were referred to the supervisor of Child Welfare and Attendance.[38]

(12) The Child Welfare and Attendance officer was a resource person, called upon to verify whether a student was legally enrolled in a system. In Ouachita Parish, the office also monitored the system as a whole to see that the principals were properly instructed in the mechanics of the freeze order.[39] Mr. Terry Hager had been the Child Welfare and Attendance Supervisor in the Monroe City system for 18 years. He unequivocally testified that the Monroe system did enforce the freeze order. He also stated that he was never told by his superintendent to give the order a liberal interpretation.

Bobby Wilson and James Harris were the Child Welfare and Attendance officers for Ouachita Parish School Board—Mr. Wilson for 11 years, Mr. Harris for 8 years. Both testified that the freeze order was rigidly

**33.** Trial testimony of City Superintendent, Dr. Sidney Seegers; past Parish Superintendent, James O. Lancaster; and present Parish Superintendent, S. T. Howell.

**34.** As an exception to this freeze order and its accompanying attendance zones, both systems allowed majority to minority transfers. Special education students did not have attendance zones. *Singleton v. Jackson Municipal Separate School Districts*, 419 F.2d 1211 (5th Cir. 1979), *cert. denied* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1971). *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).

**35.** Trial testimony of Dr. Sidney Seegers and S. T. Howell.

**36.** *Compare* GX 40 with GX 41.

**37.** GX 33.

**38.** Trial testimony of Terry Hager, City Child Welfare and Attendance Supervisor.

**39.** Trial testimony of Bobby Wilson. *See also* trial testimony of Odean Jones, Principal of Lakeshore Elementary; James McKay, Principal of Logtown; and K. L. Lindsay, Principal of Shady Grove Elementary.

enforced by OPSB, and that the students were, in fact, caught attempting to enter the system illegally.

(13) To verify addresses, both principals and Child Welfare and Attendance supervisors would check maps, utility bill addresses, and the phone book to determine a student's bona fide residence. Testimony received from the various principals of the OPSS conclusively establishes that the freeze order was uniformly and rigidly enforced without regard to a student's race. For example, Mr. N. F. Zametto, principal of Ouachita Parish High School, would send all new students coming from the City to the Office of Child Welfare and Attendance for approval before admitting the students to his Parish school.

(14) At trial, an attempt was made to prove that Mr. Wilson was removed from his position with the Child Welfare and Attendance Office because his strict enforcement of the freeze order had angered white parents. While it is true that Mr. Wilson spent two and one-half years in the Parish's physical education and drug abuse programs, there was absolutely no evidence proving that the basis of this change was the complaints of white parents. The testimony of Mr. Lancaster, former superintendent of Ouachita Parish School System and the testimony of Mr. Wilson himself, demolished the Government's innuendo. Because Mr. Wilson had a degree in physical education and training in drug enforcement, he was transferred into that area. Further, Mr. Wilson was later moved back into the Child Welfare and Attendance Office.

The Government's attempt to prove that the freeze order was selectively enforced by officials of the two school districts is refuted by the evidence. Next, the Government attempted to show that many students were actually jumping the district lines and escaping the established safeguards designed to keep students in the proper school system.

(15) Government Exhibit No. 42 is a listing of the total number of City students allegedly attending Parish school systems improperly. The listing denotes with a "C" those students who attended Parish schools in 1977–78 but had formerly attended a City school. The Government further alleges that these students still (at the time of trial) had City addresses and should therefore be enrolled in a City school. The first attempt to introduce this exhibit at trial was unsuccessful, as the Parish's cross-examination showed the exhibit fraught with errors. Many "C's" actually lived outside the City limits. Further, some listings did not show the date of entry into the system which could possibly have predated the freeze order. Finally, the list included Special Education students who were not covered by the freeze order. With 11 errors, the exhibit was not received into evidence.

The next day, Mr. Terry Hager, MCSS Child Welfare and Attendance Office supervisor, who had originally placed the "C's" on Exhibit 42, was recalled and attempted to correct the exhibit. Although the Parish still objects to the accuracy of Exhibit 42, this court accepts that 93 City students, black and white, are improperly attending Parish schools. However, these students represent less than one-third of 1 per cent of the combined enrollment of the two systems.[40] Further, the Government did not prove that any district jumping was tied to an intentional discriminatory act by any school official.

(16) Finally, in its most persuasive argument, the Government attempted to show that the overlapping attendance zones between the two systems, with the accompanying inter-district attendance, had a substantial segregative effect on both systems, particularly MCSS.

The total number of City residents attending Parish schools since 1969 cannot be computed. However, Parish Exhibit No. 2 shows the following:

---

**40.** The combined enrollment of the Monroe City School System and the Ouachita Parish School System in 1977 through 1978 was 22,938 students. *See* Appendices I and III.

CITY RESIDENTS ATTENDING PARISH SCHOOLS *

| Year | Black | White | Total |
|---|---|---|---|
| 1968- 69 | 1,814 | 1,344 | 3,158 |
| 1969 70 | 1,219 | 1,540 | 2,759 |
| 1975- 76 | 1,055 | 1,330 | 2,385 |
| 1977 78 | 1,093 | 1,250 | 2,343 |
| 1978- 79 | 1,080 | 1,084 | 2,164 |

* Data not available for school years 1970–71, 1971–72, 1972–73, 1973–74, 1974–75 and 1976–77.

In 1977–78, the year the Government's motion was filed, there were 2,343 students residing within the City limits, attending Parish schools. Of this number, 1,250 were white and 1,093 were black. The 1,250 white students attended the following Parish schools:

| School | Whites |
|---|---|
| Jack Hayes | 51 |
| Ouachita Parish High | 303 |
| Ouachita Parish Elementary- Junior High | 862 |
| Robinson * | 28 |

Government Exhibit GX–18.
* In 1977–78, Robinson was 92.8 per cent black.

Virtually all these white students attended Parish schools in which their race was in the majority.[41] Likewise, 686 of the 1,093 black children (62 per cent) attended schools in which their race was in the majority: Richwood, Robinson and Swayze. The remainder attended white Parish schools.[42]

In 1977–78, 317 Parish students attended Monroe City schools: 241 black students and 76 white students.[43] Again, the majority of these students (84 per cent) attended schools where their race was in the majority.[44] Government Exhibit 52, Column C shows the school attendance of these students to be as follows:

| School | Black | White | Total |
|---|---|---|---|
| Burkdull Faulk | 0 | 2 | 2 |
| Berg Jones | 77 | 0 | 77 |
| Carver | 12 | 0 | 12 |
| Clara Hall | 2 | 1 | 3 |
| Georgia Tucker | 0 | 8 | 8 |
| Levington | 0 | 5 | 5 |
| Lida Benton | 3 | 7 | 10 |
| Lincoln | 6 | 0 | 6 |
| Minnie Ruffin | 26 | 10 | 36 |
| Sallie Humble | 2 | 8 | 10 |
| Sherrouse | 3 | 4 | 7 |
| Carroll Junior High | 11 | 3 | 14 |
| Jefferson | 2 | 0 | 2 |
| Carroll High | 10 | 0 | 10 |
| Neville High | 6 | 10 | 16 |
| Wossman High | 38 | 12 | 50 |
| Total: | 241 | 76 | 317 |

To determine the segregative effect of these overlapping attendance zones, both parties prepared reconstruction exhibits, reflecting what the racial composition of each school would be absent the overlap.[45] These reconstructions vary slightly among the different projections. However, adding 1,250 white students to the northeastern section of the MCSS while removing only 76 white students would definitely have a significant beneficial effect to the racial balance of the MCSS. If the two systems were completely separate, all students living within the Monroe city limits would attend a City school. Under the present attendance zones, the new complexion of each Monroe City school as it would exist if the two systems were separated, appears in Column 4 of Government Exhibit 52. (*Compare* Government Exhibit 52 with the deviations shown in Parish Exhibit 7.)

Similarly, the new composition of the Parish schools would exist as appear in Col-

41.  *See* Appendix III for the racial breakdown of Parish schools in 1977–78.

42.

1977–78 Racial Breakdown of City Students Attending Parish Schools

| School | Whites | Blacks | Total |
|---|---|---|---|
| Jack Hayes | 57 | 9 | 66 |
| Lakeshore | – | 20 | 20 |
| Ouachita Parish High School | 303 | 86 | 389 |
| Ouachita Elementary-Jr. Hg. | 862 | 292 | 1154 |

1977–78 Racial Breakdown of City Students Attending Parish Schools

| School | Whites | Blacks | Total |
|---|---|---|---|
| Richwood | – | 266 | 266 |
| Robinson | 28 | 147 | 175 |
| Swayze | – | 273 | 273 |
| Total | 1250 | 1093 | 2343 |

GX 18

43.  GX 52, Column C.

44.  *Compare* GX 48 with GX 52.

45.  GX 50–53; PX 4, 7 and 8.

umn 4 of Government Exhibit 53. For the most part, the changes would make black schools blacker and white schools whiter. According to Government Exhibit 52, the City schools would undergo the change in student population shown in Appendix VIII, Columns I and II. The 1978–79 reconstruction from Parish Exhibit 4 is included as Column III in this appendix. As the Appendix indicates, Minnie Ruffin, Berg Jones and Clara Hall would have substantial changes in student population, but only the first two schools would undergo changes in their racial balance. The City junior high and high schools would also experience a notable gain of white students.

The segregative effect of this interdistrict overlap is highlighted by the fact that the City's attendance zones will soon experience substantial revision via a new desegregation plan. The purpose of the plan will be twofold: to remove all vestiges of a dual system, and to bring white students back into the MCSS because of the improved educational components incorporated into the decree. If the overlap is maintained, any attempted plan to further desegregate the MCSS will be futile. A white or a black student assigned to a City school where his race is in the minority would simply opt to attend the Parish school where his race is in the majority. Although this would not be possible in every attendance zone, the present residential patterns of the City coupled with the overlapping Parish attendance zones, shown by City Exhibits No. 17, 18 and 19, clearly indicate that in the majority of cases, a City student would be able to attend a Parish school where his race is in the majority.[46] Clearly, there is a substantial segregative effect caused by the overlapping student attendance zones between the Parish and the City system.

(17) In a final attempt to demonstrate an unlawful intent on the part of Parish school officials, the Government argued that all white Logtown Elementary-Junior High School feeds into all black Richwood High School, yet no white student has ever attended Richwood. The Government contended that the students were allowed to attend all white Ouachita Parish High School. At trial, Mr. James McKay, principal at Logtown, testified that he had 601 students, 556 white and 45 black. Approximately 32 students graduate each year. 32 per cent of these students will move, 26 per cent will simply drop out of the school system altogether and 2 per cent will go to private schools. The remaining 40 per cent are children of teachers, blacks who go to Richwood or to Ouachita Parish High School under the majority to minority transfer rule, and a small zone containing 8 students who feed into Ouachita Parish High School by court order. This testimony was corroborated by Mr. Wilson, the Child Welfare and Attendance supervisor. The Government and City failed to prove that white students are improperly allowed to attend Ouachita Parish High School.[47]

The record is simply devoid of any direct evidence impugning a segregative intent to Ouachita Parish school authorities. Only a segregative effect has been shown. However, in one-race school systems, this intent may sometimes be inferred.

### III.

The shibboleth of any school case is that "[a]s with any equity case, the nature

---

46. The following Parish elementary schools have zones which overlap Monroe city: Logtown (white) (small overlap); Robinson (black); Swayze (black); Ouachita Parish Elementary (white); Jack Hayes (white) (small overlap); Lakeshore (white) (small overlap). *See* trial testimony of Superintendent Howell, GX 44 and CX 16.

The following Parish junior high schools have zones which overlap Monroe city: Richwood (black); Logtown (white) (small overlap); Ouachita Parish Junior High (white). *See* GX 45, CX 14.

The following Parish high schools have zones which overlap Monroe city: Richwood (black) and Ouachita Parish High School (white). *See* GX 45, CX 15.

Only Ouachita Parish Junior Elementary-Junior High and Ouachita Parish High School are physically located within the city limits of Monroe. *See* trial testimony of Superintendent Howell, GX 43 and 45.

47. As pointed out by the Parish, this argument would be relevant to intradistrict violations in the OPSS, but is not germane to the present litigation.

of the violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). A constitutional violation is a necessary predicate before any remedy, intradistrict or interdistrict, can be ordered by the district court. Further, the scope of this remedy must be commensurate with the constitutional violations sought to be repaired. *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

■ To trigger the equitable powers of this court allowing interdistrict relief, the Government must prove the existence of a constitutional violation in one district having a substantial segregative effect in another. *Milliken v. Bradley, supra.* As the Chief Justice stated in *Milliken*:

Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purpose or by imposing a cross-district remedy it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

418 U.S. 744–45, 94 S.Ct. 3127.

### A.

■ Since *Milliken*, there have been several cases in which a court ordered interdistrict relief. *See, e. g., Morrilton School District No. 32 v. United States*, 606 F.2d 222 (8th Cir. 1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *United States v. Missouri*, 515 F.2d 1365 (8th Cir.) (*en banc*), *cert. denied*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); *Newburg Area Council, Inc. v. Board of Education, Louisville, Kentucky*, 510 F.2d 1358 (6th Cir. 1974), *cert. denied*, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975); *Berry v. School District of City of Benton Harbor*, 467 F.Supp. 721 (W.D.Mich.1978); *United States v. Board of School Commissioners*, 456 F.Supp. 183 (S.D.Ind.1978); *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.), *aff'd mem.* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). *See also Comment, Interdistrict Remedies for Segregated Schools*, 79 Colum.L.Rev. 1168 (1979), and *Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978), *cert. granted*, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 454 (1979). Even before the *Milliken* decision, courts had ordered the consolidation of school districts to provide an adequate remedy to correct proven intentional segregative acts by local school officials which had an identifiable interdistrict effect. *See, e. g., Haney v. County Board of Education of Sevier County*, 429 F.2d 364 (8th Cir. 1970) and *United States v. State of Texas*, 321 F.Supp. 1043 (E.D. Tex.1970), *aff'd* 447 F.2d 441 (5th Cir. 1971), *cert. denied sub nom. Edgar v. United States*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972).[48]

---

**48.** Recently, the Supreme Court summarily affirmed an unreported decision of a three-judge court in Atlanta, Georgia. The three-judge court had denied interdistrict relief in a massive desegregation suit involving six county boards of education and four city boards. *Armour v. Nix*, Civil Action No. 16,708 (N.D.Ga. filed March 1978), *aff'd*, (May 12, 1980). Considering that most of the school systems involved were unitary, or were not

However, in each of these cases, the court found that the separate school districts were either historic tools of the dual school system and established for the purpose of creating and maintaining a segregated system, or that the school districts were not separate and autonomous but interchanging students with an eye to their race. Such cases have little application to the case under consideration. The Government failed to prove that the two systems were intertwined administratively or in student assignment. As the Government admits, neither district was created, nor its lines drawn with a discriminatory motive. The boundaries of the Monroe system are co-terminus with the city's corporate limits and have expanded with the city's growth to encompass what was at one time two outlying parish schools. As in *Milliken*, this court is faced with "independent school districts historically administered as separate units...." 418 U.S. at 743, 94 S.Ct. at 3126.

Further, the proof conclusively established that the only interdistrict student attendance was that allowed by a 1969 court order, the terms of which were neutrally applied by both school systems. A total of 93 students were proven to be attending Parish schools illegally. Such a small number of students is *de minimis* and certainly not the result of an intentional act by the Ouachita Parish School officials. As stated in *Evans v. Buchanan*, 416 F.Supp. 328, 339 (D.Del.1976):

> The mere fact that an inter-district violation occurred does not necessarily require an inter-district remedy. It is too long-standing a rule of equity to require a citation that although equity will give complete relief, it will limit the exercise

shown to be guilty of equal protection violations, the court found no "significant violation of recent vintage." *Armour* at 26. No interdistrict relief was ordered.

Although the decision is not controlling in a case such as the present one involving two non-unitary systems with overlapping student attendance zones, it does lend support to the granting of limited relief in this case. In *Armour*, as in this case, there was no showing of an intentional constitutional violation requiring

of its power to a remedy which is reasonably necessary and likely to succeed. Moreover, an inter-district violation having only *de minimis* effects will not require school desegregation across district lines.

The present situation is also distinct from a case involving interdistrict transfers between two or more school districts which have separate geographical areas and district lines which do not physically overlap. Consequently, this is not a strict interdistrict transfer case triggering a *Singleton* violation.[49] *See, e. g., Lee v. Eufaula City Board of Education*, 573 F.2d 229 (5th Cir. 1978). In *Lee*, the court held that the cumulative effect on desegregation or reinforcing the existence of a dual school system must be measured on a school-by-school basis when interdistrict transfers were involved. Although factually very close to the present case, the *Lee* court spoke in terms of *Singleton* and "nonresident" transfers. The school districts involved in the *Lee* case were separate geographic divisions with no apparent overlap.

■ Each student in the Monroe city limits is a resident of two school districts—OPSS and MCSS. Although the analysis in *Lee* is not directly relevant to a resolution of this case, this court has attempted to examine the cumulative effect of this overlap on each school in the Monroe city system. This examination has been on both the quantitative and qualitative level. By examining the reconstruction exhibits, it is apparent that a cumulative segregative effect occurs in the MCSS as a result of the overlap in attendance zones between the City system and the Parish system.[50]

the consolidation of independent school systems.

49. *Singleton v. Jackson Municipal Separate School District, supra.*

50. On the other hand, the 317 City students attending Parish schools are such a miniscule portion of the entire Parish student population that the effect is quantitatively nonexistent. However, considering that these transfers take place in a rather small geographic area—the

If Parish Students are allowed to attend City schools, the identical effect sought to be avoided in the City system will occur—a student will be able to escape any Parish desegregation plan by opting out of the Parish system and attending the City system where his race may be in the majority. Accordingly, it is the opinion of this court that the reciprocal transfer provisions between the City and the Parish and the Parish and the City have a substantial segregative effect on the two systems.

### B.

■ To establish an equal protection violation in a school desegregation case, plaintiff must show an improper motive—that is, that the school officials intended to segregate the two races. The Government must prove not only that the segregated schools exist, but it must also establish that the dual system was brought about or maintained by intentional state action. *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).[51] The Government was unsuccessful in establishing direct proof that the actions by school authorities were tied to a segregative motive. Indeed, in Interrogatory No. 9 of Parish Exhibit 6, the government stated that:

The United States case, to date, does not rely on intent to discriminate by the Parish with respect to administration of the existing desegregation plan.

Further, in Interrogatory No. 17, the Government stated that no racial animus in the interdistrict transfers is alleged—just substantial segregative effect. Of course, *Milliken* forbids an interdistrict remedy absent the finding of a constitutional violation which would be lacking in the present case

if intent is not proven. However, this intent may also be inferred and proven by circumstantial evidence.

Where a racially discriminatory school system has been found to exist, *Brown II* imposes a duty on local school boards to "effectuate a transition to a racially nondiscriminatory school system". *Brown v. Board of Education of Topeka*, 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). School boards were charged with an affirmative duty to take whatever steps may be necessary to convert a dual system into a unitary system in which racial discrimination could be eliminated "root and branch". *Green v. County School Board of New Kent County*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Since 1955, the Ouachita Parish School Board and the Monroe City School Board have been under a continuous constitutional obligation to disestablish their respective dual school systems. Both have failed to discharge this duty, as indicated by the presence of so many one-race schools in each system. The failure or the refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment. *Dayton Board of Education v. Brinkman (Dayton I)*, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977); *Swann v. Charlotte-Mecklenburg Board of Education, supra.*

The court has found that in 1955, the defendants were still intentionally operating a dual school system in violation of the equal protection clause of the Fourteenth Amendment and the mandate of *Brown v. Board of Education of Topeka (Brown I)*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Until 1965, the school systems had violated their continuing duty to eradicate the effects of that dual system. Considering the current pervasive racial segregation in the two systems, the court feels that it is

eastern fringes of the City—it is apparent that they have a segregative effect on the Parish system immediately surrounding the MCSS.

**51.** The cases establishing intent as a prerequisite for proving a constitutional violation are legion: *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *United States v. Texas Education Agency (Austin Independent School District)*, 564 F.2d 162 (5th Cir. 1977), cert. denied, 433 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979).

warranted in finding that the school boards' failure to fulfill their affirmative duties has tended to perpetuate or increase segregation in the two systems. As the Supreme Court has stated, part of the affirmative duty is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects. *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972).[52]

This court feels that the prior existence of *de jure* segregation, coupled with the one-race schools in both systems, justifies the presumption of an intent to discriminate on the part of local school authorities. *United States v. DeSoto Parish School Board,* 574 F.2d 804, 813 n. 20 (5th Cir.), cert. denied 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653 (1978); *Lee v. Demopolis City School System,* 557 F.2d 1053 (5th Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978); *Lee v. Macon County Board of Education,* 616 F.2d 805 (5th Cir. 1980). In both Monroe City and Ouachita Parish, segregation by law has ended, but neither this event nor subsequently required affirmative steps to deseg-

regate the schools has removed all vestiges of the dual school system.

■ Of course, the power of the federal courts to compel desegregation in state school systems is circumscribed. The authority to order remedial action depends upon a determination that the state law has discriminated on a basis of a student's race. *See Swann v. Charlotte-Mecklenburg, supra; Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Dayton I, supra.* It is also clear that *de facto* segregation alone cannot support a court order mandating affirmative action. *Keyes v. School District No. 1, supra; Milliken v. Bradley, supra; Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705 (2nd Cir. 1979). This court is bound by this limitation. However, in the anomalous situation facing the court with two political entities servicing the same geographic area, it is fair to presume an intent to segregate and therefore find a constitutional violation when the two systems operate with predominantly one-race schools twenty-five years after *Brown.*[53]

■ Accordingly, this court concludes that a limited interdistrict violation has

---

**52.** Both *Wright v. Council of City of Emporia* and *United States v. Scotland Neck City Board of Education* have been cited by the government as support for proving an interdistrict violation in this case. Both cases, decided the same day by the Supreme Court, involved an attempt to form an independent and separate school system after *Brown v. Board of Education* was decided. These cases have no applicability in the current matter where it is agreed that the two systems were established long before *Brown v. Board of Education* or the filing of a school desegregation suit. However, the cases are instructive in defining the parameters of a school board's affirmative duty to see that the dual school system is disestablished.

**53.** Candidly, this court is slow to intrude on local political autonomy. Such a remedy is usually left to the legislature or a vote of the people. However, in this case, it is clear that the majoritarian process cannot correct the anomaly of two school systems serving the same geographic area. When this anomaly perpetuates the past effects of a dual school system, judicial intervention is mandated.

As stated in *Milliken*:

[N]o state law is above the constitution. School district lines and the present laws with respect to local control, are not sacrosanct and if in conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies.

*Milliken,* 418 U.S. at 744, 94 S.Ct. at 3127. Indeed, the friction between these two political entities has resulted in previous litigation. *See, e. g., Rutledge v. State of Louisiana,* 330 F.Supp. 336 (W.D. of La. 1971) (class action by Parish residents seeking to prevent City residents from voting in parish school board elections); *Ouachita Parish School Board v. Monroe City School Board,* Civil Action 11,521, filed in the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana, on September 22, 1978. (In this pending state court suit, Ouachita Parish School Board seeks to enjoin Monroe City School Board from collecting school taxes in Parish areas recently annexed by the City.) The possibility of consolidating the two systems has been considered long before the present litigation was filed. (*See* Appendix VII—letter of the Monroe City School Board to the Ouachita Parish School Board posing consolidation of the two entities.) However, no action has been taken to separate or consoli-

been established. The remedy tailored to redress this specific wrong is that the two school systems will no longer geographically overlap.[54] All students residing within the corporate limits of the City of Monroe will attend Monroe City Schools only. All students residing outside the City limits of Monroe, but within the Parish of Ouachita, will attend Parish Schools only. The overlapping Parish school attendance zones reflected in City Exhibits 14–19 will be abolished. The seven schools with overlapping attendance zones must redraw their zones so that only Parish residents residing outside the City of Monroe can be in attendance.[55] The court realizes the problem this will cause with the two schools—Ouachita Parish Elementary-Junior High and Ouachita Parish High School—which are physically within the boundaries of the City of Monroe. At this time, the court makes no indication of what alternative the Parish may take. It may, of course, bus students from the Parish into these two schools, or it may sell the schools to the City of Monroe. The specifics of this separation shall be worked out in the remedy stage of these proceedings. Finally, the boundaries of the Monroe City School System shall remain co-terminus with the boundaries of the City. This includes any annexations.

## IV.

■ Before turning to the intradistrict aspects of this case, the court must address one final issue: the refusal to qualify Ms. Diana May Pearce as the Government's witness concerning the effects of segregated schools on the housing patterns of the Monroe area.

The admission or exclusion of expert testimony is within the sound discretion of the trial court, and the decision will not be disturbed on appeal unless that discretion has been abused. *Bauman v. Centex Corp.*, 611 F.2d 1115 (5th Cir. 1980); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681 (5th Cir. 1969); *Keystone Plastics v. C. & P. Plastics*, 506 F.2d 960 (5th Cir. 1975). Expert testimony in such a complicated field as urban studies can be extremely helpful to the lay judge wrestling with the many varied disciplines involved in resolving an interdistrict school desegregation lawsuit.[56]

Cases have held that if the intentional segregative acts of local school officials helped establish the residential patterns of a metropolitan area, then the segregated status of the schools will be found to violate the constitution, despite the otherwise neutral appearance of the official actions. *United States v. Texas Education Agency*, 600 F.2d 518, 527 (5th Cir. 1979); *United States v. Board of School Commissioners of the City of Indianapolis*, 541 F.2d 1211 (7th Cir. 1976), *cert. denied* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Such a showing was crucial to the Government's case seek-

---

date the two systems. When the political process fails to correct such an egregious constitutional violation, judicial intervention is required. *See* Fiss, *Forward: The Forms of Justice*, 93 Harv.L.Rev. p. 1 (1979).

**54.** The usual remedy that comes to mind when a court speaks in terms of an interdistrict violation is consolidation of student attendance zones. In this case, the opposite remedy is ordered—separation of zones. An indication of the unique nature of the litigation currently before this court.

**55.** Any transfers under this modified order meeting the standards required by *Singleton* shall be allowed. The Fifth Circuit decision in *Singleton v. Jackson Municipal Separate School District, supra*, sets forth the guidelines for allowing interdistrict transfers:

If the school district grants transfers to students living in the district for their attendance at public school outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a nondiscriminatory basis, except that it shall not consent to transfers where the cumulative effect will reduce desegregation in either district or reinforce the dual system. 419 F.2d at 1218–19. *See also* La.R.S. 17:155.

**56.** Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ing total consolidation of the two school systems. The court solicited expert testimony on this issue before trial. Dr. Seegers, who had great personal knowledge of the general racial makeup of the different parts of the city, testified at trial. However, the MCSS superintendent did not profess to be a demographer, and he did not attempt to tie his general observations about the housing patterns to specific discriminatory acts by local school officials.

This court is slow to apply the stamp of "expert" on a witness, academic qualifications notwithstanding,[57] unless the purported expert has had an opportunity to view the individual situation with all its vagaries. Practical application of a witness' expertise is essential if a reliable opinion is to be formed. *See Poland v. Beaird-Poulan*, 483 F.Supp. 1256 (W.D.La.1980). On the Friday before the Wednesday trial, the Parish attempted to depose Ms. Pearce. She knew absolutely nothing about the metropolitan area and had no opinion concerning the effect of residential housing patterns on the racial composition of the area schools. The attempted deposition was futile. She then traveled to Monroe for trial and spent approximately one day in the area before attempting to give her opinion on the residential housing patterns. She spent a few hours viewing the system. Neither school systems nor urban areas operate in a vacuum. General textbook theories may not be applied across-the-board in such a complicated matter.

The imbroglio surrounding the tendered testimony of this expert is unfortunate. Counsel for the government tendered an expert who had absolutely no familiarity with the Monroe-Ouachita Parish area, yet she was to give testimony affecting 27,900 school children in 50 schools, not to mention countless parents, property values, lifetime investments and two long-standing political entities. The court is not attempting to impugn the professional integrity of either the expert or counsel for the Government. However, this court encountered the same problem with the Government in *United States v. Red River Parish Schools*, Civil Action No. 14,796 (opinion filed July 23, 1979, W.D. of La.)[58] Further, at the time this action was tried, this judge was responsible for two divisions covering most of North Louisiana. This court's jurisdiction encompassed 21 parishes with at least one school system in each parish.[59]

When this court hears a desegregation suit, it is imperative that the parties, in an adversarial context, supply this court with accurate and pertinent information upon which a resolution of difficult constitutional questions can be based. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). An informed decision is especially necessary when dealing with such a valuable commodity as this country's school-age children and the nation's public educational system.

Expert testimony can be most helpful, indeed crucial. This judge is not a professional educator or demographer. The court encouraged and did solicit an expert from the Government; however, this court was asked to place the imprimatur of expert on a witness who knew nothing about the locality. We must not lose sight of our purpose here: to see that all children, black and white, receive quality education in a color blind system. The teachings of *Brown* and its progeny are a lodestar to this court. No one has helped, no one is advanced in society when such a regrettable lapse has occurred in so important a matter.

## VI.

The defendant, Monroe City School Board, has admitted at trial that the School

---

**57.** Ms. Pearce's curriculum *vitae* is GX 61.

**58.** In footnote 3 of its Opinion in *Red River Parish*, this court stated:

The expert witness for the United States estimated higher capacities for some of the schools but his testimony in this area can be accorded little weight as he was never afforded an opportunity to visit any of the schools.

**59.** The Caddo Parish desegregation suit was handled by Chief Judge Nauman S. Scott, Alexandria Division, Western District of Louisiana, at the time of the trial.

Board has not fulfilled its affirmative obligation to remove all vestiges of a dual system. *Swann v. Charlotte-Mecklenburg, supra; Green v. County Board of Education, supra; Brown II, supra.*[60] Fourteen years after the original desegregation case was filed, the system is still highly segregated by race. In 1978, four schools were over 90 per cent one race.[61] The system's faculty is also not desegregated pursuant to *Singleton* requirements.[62]

This court has found that the Monroe public schools were officially segregated by race in 1954 when the Supreme Court decided *Brown v. Board of Education.* The dual system persisted in 1965 when the original desegregation suit was filed, and today the Board has admittedly failed to dismantle this dual system. *Dayton Board of Education v. Brinkman (Dayton I), supra.* This failure is system-wide, requiring a system-wide remedy. *Keyes v. School District No. 1, supra.*

A school system found to be in violation of the constitution has a duty to take the necessary steps to eliminate from the public school system all vestiges of state-imposed segregation. *Milliken v. Bradley, supra; Swann v. Charlotte-Mecklenburg, supra.* If the School Board defaults in this duty, the responsibility of the District Court is equally clear and compelling: to use its broad and flexible remedial powers to implement a remedy, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises "realistically to work now". *Green v. County School Board, supra; Columbus Board of Education v. Penick, supra.*

The validity of intervenor Lloyd Gill's motion is conceded. The present plan, especially the multiple annual school change of the Lee-Carroll-Neville debacle is educationally unsound. The plan has not been successful in stemming white flight.[63] Having found the constitutional violation, this court is now required to tailor "the scope of the remedy" to fit the nature and extent of the constitutional violation. *Milliken v. Bradley,* 418 U.S. at 744, 94 S.Ct. at 3127; *Swann v. Charlotte-Mecklenburg,* 402 U.S. at 16, 91 S.Ct. at 1276; *Hills v. Gautreaux,* 425 U.S. at 293–4, 96 S.Ct. at 1544–1545. The condition that offends the constitution is *de jure* segregation in the schools. The remedial measures ordered are not to punish the School Board for its acts, rather the goal is to restore the victims of discriminatory conduct to the position they would have enjoyed in a system free from pervasive *de jure* segregation. *Columbus Board of Education v. Penick,* 99 S.Ct. at 2970; *Milliken v. Bradley (Milliken II),* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977); *Dayton Board of Education v. Brinkman (Dayton I),* 433 U.S. 406, 419, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977); *United States v. Texas Education Agency,* 600 F.2d 518, 530 (5th Cir. 1979). In this case, it is the limited interdistrict violation and the admitted intradistrict violation that has been found pernicious. These violations are to be corrected at the remedy stage of these proceedings.

To achieve an educationally-sound, publicly acceptable and racially-balanced plan, this court intends to make use of all available techniques involving many recently developed educational components. To aid in sculpturing a remedy, the court requires the

---

**60.** *See* trial testimony of Monroe City School System Superintendent, Dr. Sidney Seegers and closing remarks of School Board attorney Paul Kidd.

**61.** GX 48.

**62.** GX 1 and 21. As stated by the Supreme Court in *Swann*:

Existing policy and practice with regard to faculty, staff, transportation, extra curricular activities and facilities were among the most important indicia of a segregated system.

*Swann,* 402 U.S. at p. 18, 91 S.Ct. at p. 1277. *See also United States v. Montgomery Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

**63.** It is interesting to note that the Monroe City School Board had proposed a new plan on July 5, 1977. *See* GX 8. The Board attempted to enter into a consent decree with the original plaintiffs, adopting this new plan. When this failed, the plan was dropped and no further action taken. The Government announced that it would oppose this plan.

submission of desegregation plans from both the School Board and the Government. If the plaintiff-intervenor, Ada Blakes, and the defendant-intervenor, Lloyd Gill, desire to submit a plan, it will also be considered. To insure success, the court will make the following comments upon the procedure to be used in the remedy stage of these proceedings, as well as certain educational components that should be considered in arriving at a workable desegregation plan. To insure a smooth transition in the separation of the two systems, the Ouachita Parish School Board will also be involved in the aspects of the plan affecting the separation of the attendance zones of the two systems.

## VII.

In fashioning and effectuating a desegregation decree, the court will be guided by traditional equitable principles. Practicality and flexibility are essential for adjusting and reconciling public and private interests, as well as achieving the ends of a desegregated school system.[64] To assist this court in evaluating and deciding the difficult questions proposed by the remedy phase of this school desegregation case, this court has decided to appoint a Special Master pursuant to Rule 53(b) of the Federal Rules of Civil Procedure. The court will give the parties until the close of business on Monday, June 30, 1980, to submit the name of an individual acceptable to all parties as Special Master. If the parties cannot agree, this court will appoint a Special Master.

This Special Master will be authorized to collect evidence, to conduct formal and informal hearings, to consult with federal, state and local public officials, to consult with community groups, civic organizations, and others, and to subpoena witnesses and records. With prior leave of this court, he may retain experts, commission studies and reports. It shall be the duty of the Special Master to review initially the remedial plans submitted to the court. He shall consider whether the plans promise to desegregate the Monroe City School System in an effective and timely manner, whether the plans are fair and reasonable, and whether they are educationally sound. He will also supervise the separation of the attendance zones of OPSS and MCSS. The Special Master will also consider the costs of the plans and possible avenues of the funding.

In the event the submitted plans fail to express the full range of options available to the court, the Special Master is authorized to formulate alternative proposals. The Special Master is to submit to the court a report including an evaluative summary of the various plans he has considered, and a recommendation that a particular plan or an amalgamation of different plans be adopted.

The Special Master will remain under close supervision of this court, reporting frequently to this judge on his activities. He need not file findings of fact and conclusions of law under Rule 53(e)(1). His reports and recommendations shall not be *final or given presumptive effect*; all matters referred to the Special Master shall remain open for determination by this court.

The Special Master's compensation and expenses shall be shared equally by all parties. Any party who wishes to file objections to the appointment of the Special Master or to his designation of duties, shall do so within five (5) days of this opinion.

The court will also require that an educational expert be employed in drafting the desegregation plan. If the parties find an expert who could also serve as Special Master, these two functions can be combined. When faced with the polycentric problems involved in the school desegregation remedy, the court needs the expertise and assistance of a professional educator. The skilled expert who can coordinate the efforts of the parties is crucial if a workable and just

---

**64.** In fashioning this remedy, "the district judge or the school authorities should make every effort to achieve the greatest possible degree of actual desegregation taking into account the practicalities of the situation." *Davis v. School Commissioners of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

remedy is to be devised. Again, the compensation for this expert or expert-Special Master shall be borne equally by all parties. Of course, Ouachita Parish School Board shall only be responsible for compensating for services necessary in implementing a smooth transition in separating the attendance zones of the two systems. It shall in no way be responsible for devising a desegregation plan to be used solely by the Monroe City School System.

The Monroe City School Board may consider a desegregation planning committee with the interest of both the Blakes and Gill intervenors represented, as well as the Ouachita Parish School Board. The bi-racial committees may serve in this capacity. This court would also consider it advisable that a two-stage implementation framework is devised. A third stage, consisting of monitoring, may be necessary at some point in the future.

Phase One shall begin as soon as this opinion is filed. Phase One shall consist of the implementation of certain preparatory programs designed to insure the success of the ultimate desegregation plan arrived at by the parties. To insure that the remedy plan is implemented smoothly and effectively, it is necessary for the defendants to provide the students, parents, school personnel, and the community at large with accurate information concerning the precise ramifications of the remedy phase of this litigation. The defendant should also recognize the need to involve these various groups in the implementation of the remedy phase of this litigation. Actual information dissemination and encouraging community involvement will be left up to the school boards. However, the school boards should strive for rumor control and provide the community with current and accurate information as to the progress of this lawsuit. A community orientation and information service should be a component of the desegregation plan, including allowances for public information and parents/student participation.

Also during Phase One, it shall be necessary for the defendants to orient students and professional staff to the desegregation process. Defendant should prepare and implement in every elementary, junior high, and high school, curricular modifications designed to explain the desegregation process to the students and answer their questions and concerns. Likewise, faculty staff and parental orientation should be of paramount importance. In any plan, the effects on the extracurricular activities of the schools should not be overlooked.

Phase Two shall consist of the implementation of the student reassignment plan plus other necessary desegregation plan components devised by the Monroe City School Board. Reassignment of pupils shall not commence until the beginning of the 1981–82 school year. However, the MCSS should take immediate steps to modify the multiple school changes currently required in its junior high and high schools.

IT IS ORDERED that the following principles be observed in promulgating the pupil reassignment component of the remedy plan:

(1) The plan must be capable of desegregating the entire Monroe City School System. The planners may use any techniques including pairing, clustering, feeder patterns, boundary changes, attendance zones, or others that they believe will accomplish optimum desegregation while at the same time guaranteeing an educationally sound system and a halt to white flight.

(2) The plan shall refer to a survey of transportation alternatives and estimated costs.

(3) Alternative schools and career centers may be considered as long as they reflect the proper racial balance.

The plan should also promise the nondiscriminatory assignment of administrators within the system. Further, implementation of the remedy in this case will necessarily impact upon the assignment of faculty and staff within the school system, and may require some faculty and staff adjustments.

The remedy plan shall not become effective until the start of the 1981 school year.

However, to insure that the parties are moving rapidly toward a valid desegregation plan, a joint preliminary report shall be submitted to this court by the close of business on Friday, June 20, 1980. This preliminary report shall set forth in detail the parties' efforts in arriving at appropriate student reassignment plans, transportations plans and faculty and staff desegregation.

This court pledges to work rapidly and effectively with all parties to insure the drafting of a workable desegregation plan for the Monroe City School System. Likewise, it is imperative that an effective transition shall be made in separating the overlapping attendance zones between the Monroe City School System and the Ouachita Parish School System. The problems of the two Parish schools within the City, as well as the proximity of various Parish schools to the present City boundaries, are complex topics that will require further information before a solution is found. This court approaches with trepidation the sensitive task before it. However, in the proper perspective, and with the help of all parties, a workable solution can be achieved. In closing, the parties and this court will do well to keep in mind the following statement by Justice White:

A variety of procedures and techniques are available to a District Court engrossed in fashioning remedies in a case such as this; but the courts must keep in mind that they are dealing with the process of *educating* the young, including the very young. The task is not to devise a system of pains and penalties to punish constitutional violations brought to light. Rather, it is to desegregate an *educational* system in which the races have been kept apart, without, at the same time, losing sight of the central *educational* function of the schools.

*Milliken v. Bradley*, 418 U.S. at 764, 94 S.Ct. at 3136–3137 (Justice White dissenting).

APPENDIX I

Student Enrollment By Race For Each School
In The Monroe City School System, 1977-78

| School | Black | White | Total | %B | %W |
|--------|-------|-------|-------|-----|-----|
| Elementary: | | | | | |
| Barkdull Faulk | 145 | 122 | 267 | 54.3 | 45.7 |
| Berg Jones | 783 | 5 | 788 | 99.4 | .6 |
| Carver | 428 | 10 | 438 | 97.7 | 2.3 |
| Clara Hall | 130 | 170 | 300 | 43.3 | 56.7 |
| Clark | 688 | 0 | 688 | 100 | 0 |
| Georgia Tucker | 46 | 236 | 282 | 16.3 | 83.7 |
| Lexington | 176 | 284 | 460 | 38.3 | 61.7 |
| Lida Benton | 102 | 167 | 269 | 37.9 | 62.1 |
| Lincoln | 659 | 0 | 659 | 100 | 0 |
| Minnie Ruffin | 177 | 104 | 281 | 63.0 | 37.0 |

| School | Black | White | Total | %B | %W |
|---|---|---|---|---|---|
| Elementary: | | | | | |
| Sallie Humble | 155 | 329 | 484 | 32.0 | 68.0 |
| Sherrouse | 338 | 70 | 408 | 82.8 | 17.2 |
| Junior High: | | | | | |
| Carroll | 332 | 88 | 420 | 79.0 | 21.0 |
| Jefferson | 130 | 499 | 629 | 20.7 | 79.3 |
| Lee | 304 | 96 | 400 | 76.0 | 24.0 |
| High School: | | | | | |
| Carroll | 733 | 122 | 855 | 85.7 | 14.3 |
| Neville | 290 | 411 | 701 | 41.4 | 58.6 |
| Wossman | 596 | 259 | 855 | 69.7 | 30.3 |
| Total: | 6212 | 2972 | 9184 | 67.6 | 32.4 |

GX 48

## APPENDIX II

### Student Enrollment By Race For Each School In The Monroe City School System, 1978-79

| School | Black | White | Total | %B | %W |
|---|---|---|---|---|---|
| Elementary: | | | | | |
| Barkdull Faulk | 160 | 122 | 282 | 56.7 | 43.3 |
| Berg Jones | 733 | 6 | 739 | 99.2 | .8 |
| Carver | 445 | 10 | 455 | 97.8 | 2.2 |
| Clara Hall | 162 | 172 | 334 | 48.5 | 51.5 |
| Clark | 687 | 0 | 687 | 100 | 0 |
| Georgia Tucker | 29 | 270 | 299 | 9.7 | 90.3 |
| Lexington | 158 | 289 | 447 | 35.3 | 64.7 |
| Lida Benton | 116 | 166 | 282 | 41.1 | 58.9 |
| Lincoln | 618 | 0 | 618 | 100 | 0 |

| School | Black | White | Total | %B | %W |
|---|---|---|---|---|---|
| Elementary: | | | | | |
| Minnie Ruffin | 199 | 75 | 274 | 72.6 | 27.4 |
| Sallie Humble | 146 | 329 | 475 | 30.7 | 69.3 |
| Sherrouse | 340 | 52 | 392 | 86.7 | 13.3 |
| Junior High: | | | | | |
| Carroll | 381 | 74 | 455 | 83.7 | 16.3 |
| Jefferson | 516 | 127 | 643 | 80.2 | 19.8 |
| Lee | 271 | 96 | 367 | 73.8 | 26.2 |
| High School; | | | | | |
| Carroll | 721 | 130 | 851 | 84.7 | 15.3 |
| Neville | 281 | 361 | 642 | 43.8 | 56.2 |
| Wossman High | 704 | 222 | 926 | 76.0 | 24.0 |
| Total: | 6667 | 2501 | 9168 | 72.7 | 27.3 |

GX 48

## APPENDIX III

Student Enrollment By Race For Each School
In The Ouachita Parish School System, 1977-78

| School | White | Black | Total | %B | %W |
|---|---|---|---|---|---|
| Boley | 463 | 26 | 489 | 5.3 | 94.7 |
| Calhoun | 364 | 132 | 496 | 26.6 | 73.4 |
| Central | 369 | 111 | 480 | 23.1 | 76.9 |
| Claiborne | 565 | 16 | 581 | 2.8 | 97.2 |
| Crosley | 166 | 93 | 259 | 36.0 | 64.0 |
| Drew | 481 | 3 | 484 | .7 | 99.3 |
| Special Education Eastside | 74 | 43 | 117 | 36.8 | 63.2 |
| Jack Hayes | 1082 | 12 | 1094 | 1.0 | 99.0 |

| School | White | Black | Total | %B | %W |
|--------|-------|-------|-------|-----|-----|
| Highland | 336 | 57 | 393 | 14.5 | 85.5 |
| Kiroli | 611 | 1 | 612 | .2 | 99.8 |
| Lakeshore | 383 | 39 | 422 | 9.2 | 90.8 |
| Lenwil | 427 | 0 | 427 | 0 | 100 |
| Logtown | 538 | 39 | 577 | 6.8 | 93.2 |
| Millsaps | 300 | 78 | 378 | 20.6 | 79.4 |
| Mitchell | 135 | 55 | 190 | 29.0 | 71.0 |
| Ouachita Parish High School | 1061 | 97 | 1158 | 8.4 | 91.6 |
| Ouachita Parish Elementary-Junior High | 1321 | 347 | 1668 | 20.8 | 79.2 |
| Pinecrest | 232 | 2 | 234 | .9 | 99.1 |
| Ransom | 208 | 140 | 348 | 40.2 | 59.8 |
| Richardson | 116 | 94 | 210 | 44.8 | 55.2 |
| Richwood | 0 | 905 | 905 | 100 | 0 |
| Riser | 887 | 104 | 991 | 10.5 | 89.5 |
| Robinson | 35 | 451 | 486 | 92.8 | 7.2 |
| Special Education Selman | - | - | - | - | - |
| Shady Grove | 191 | 249 | 440 | 56.6 | 43.4 |
| A. L. Smith | 245 | 79 | 324 | 24.4 | 75.6 |
| Sterlington | 217 | 63 | 280 | 22.5 | 77.5 |
| Swartz | 1102 | 23 | 1125 | 2.0 | 98.0 |
| Swayze | 0 | 546 | 546 | 100 | 0 |
| West Monroe High | 1453 | 194 | 1647 | 11.8 | 88.2 |
| West Monroe Jr. | 631 | 70 | 701 | 10.0 | 90.0 |

| School | White | Black | Total | %B | %W |
|---|---|---|---|---|---|
| Special Education Westside | 54 | 45 | 99 | 45.5 | 54.5 |
| Woodlawn | 563 | 20 | 583 | 3.4 | 96.6 |
| Total: | 14610 | 4144 | 18754 | 22.1 | 77.9 |

GX 39
PX 1

## APPENDIX IV

Student Enrollment By Race For Each School
In The Ouachita Parish School System, 1978-79

| School | White | Black | Total | %B | %W |
|---|---|---|---|---|---|
| Boley | 481 | 17 | 498 | 3.4 | 96.6 |
| Calhoun | 357 | 138 | 495 | 27.9 | 72.1 |
| Central | 398 | 108 | 506 | 21.3 | 78.7 |
| Claiborne | 537 | 19 | 556 | 3.4 | 96.6 |
| Crosley | 158 | 80 | 238 | 33.6 | 66.4 |
| Drew | 508 | 2 | 510 | .4 | 99.6 |
| Special Education Eastside | 80 | 51 | 131 | 38.9 | 61.1 |
| Jack Hayes | 1093 | 15 | 1108 | 1.4 | 98.6 |
| Highland | 343 | 45 | 388 | 11.6 | 88.4 |
| Kiroli | 624 | 2 | 626 | .3 | 99.7 |
| Lakeshore | 490 | 34 | 524 | 6.4 | 93.6 |
| Lenwil | 394 | 0 | 394 | 0 | 100 |
| Logtown | 556 | 45 | 601 | 7.5 | 92.5 |
| Millsaps | 277 | 84 | 361 | 23.3 | 76.7 |
| Mitchell | 184 | 54 | 238 | 22.7 | 77.3 |
| Ouachita Parish High School | 1069 | 107 | 1176 | 9.1 | 90.9 |

| School | White | Black | Total | %B | %W |
|---|---|---|---|---|---|
| Ouachita Parish Elementary-Junior High | 1226 | 329 | 1595 | 23.1 | 76.9 |
| Pinecrest | 230 | 2 | 232 | .8 | 99.2 |
| Ransom | 186 | 129 | 315 | 41.0 | 59.0 |
| Richardson | 114 | 105 | 219 | 47.9 | 52.1 |
| Richwood | 2 | 950 | 952 | 99.8 | .2 |
| Riser | 747 | 95 | 842 | 11.3 | 88.7 |
| Robinson | 26 | 452 | 478 | 94.6 | 5.4 |
| Special Education Selman | - | - | - | - | - |
| Shady Grove | 155 | 282 | 437 | 64.5 | 35.5 |
| A. L. Smith | 231 | 70 | 301 | 23.3 | 76.7 |
| Sterlington | 171 | 59 | 230 | 25.7 | 74.3 |
| Swartz | 1162 | 25 | 1187 | 2.1 | 97.9 |
| Swayze | 1 | 573 | 574 | 99.8 | .2 |
| West Monroe High | 1425 | 173 | 1598 | 10.8 | 89.2 |
| West Monroe Jr. | 621 | 63 | 684 | 9.2 | 90.8 |
| Special Education Westside | 39 | 48 | 87 | 55.2 | 44.8 |
| Woodlawn | 632 | 17 | 649 | 2.6 | 97.4 |
| Total: | 14517 | 4313 | 18730 | 22.5 | 77.5 |

GX 39

PX 1

## APPENDIX V

Monroe City Schools Originally Built
For One Race

*Black Schools:*

Berg Jones
Carver
Clark
Lincoln
Carroll Junior High
Carroll High

*White Schools:*

Barkdull Faulk
Clara Hall
Georgia Tucker
Lexington
Lida Benton
Minnie Ruffin
Sallie Humble
Sherrouse
Jefferson Junior High
Lee Junior High
Neville High
Wossman

Ouachita Parish Schools Originally
Built For One Race

*Black Schools:*

Boley
Central
Richardson
Richwood
Robinson
Swayze

*White Schools:*

Calhoun
Claiborne
Crosley
Drew
Highland
Jack Hayes
Kiroli
Lakeshore
Lenwil
Logtown
Millsaps
Mitchell
Ouachita Parish High School
Ouachita Parish Junior High
Pinecrest
Ransom
Riser
Shady Grove
A. L. Smith
Sterlington
Swartz
West Monroe High School
West Monroe Junior High
Woodlawn
Mavtec
Westside
GX 17 and 47

## APPENDIX VI

### White Exodus From City System

| School Years | White Students | % White | Black Students | % Black | Total |
|---|---|---|---|---|---|
| 1965-66 | 5343 | 50.5 | 5239 | 49.5 | 10582 |
| 1966-67 | 5622 | 51.3 | 5342 | 48.7 | 10964 |
| 1967-68 | 5791 | 49.5 | 5897 | 50.5 | 11688 |
| 1968-69 | 5792 | 52.0 | 5353 | 48.0 | 11145 |
| 1969-70 | 5644 | 51.4 | 5347 | 48.6 | 10991 |

**404**

| School Years | White Students | % White | Black Students | % Black | Total |
|---|---|---|---|---|---|
| 1970-71 | 4342 | 44.8 | 5311 | 55.2 | 9653 |
| 1971-72 | 4184 | 43.4 | 5464 | 56.6 | 9648 |
| 1972-73 | 4007 | 41.5 | 5653 | 58.5 | 9660 |
| 1973-74 | 3395 | 36.9 | 5814 | 63.1 | 9209 |
| 1974-75 | 3116 | 33.2 | 6264 | 66.8 | 9380 |
| 1975-76 | 2887 | 31.3 | 6228 | 68.7 | 9115 |
| 1976-77 | 2868 | 30.8 | 6447 | 69.2 | 9315 |
| 1977-78 | 2972 | 32.4 | 6212 | 67.6 | 9184 |
| 1978-79 | 2501 | 27.3 | 6667 | 72.7 | 9168 |

GX 48

---

APPENDIX VII

April 2, 1973

Mrs. Marie Louise Snellings, President

Mr. Clem Toston, Member

Mr. Bill DeMoss, Member

Ouachita Parish School Board

Post Office Box 1642

Monroe, Louisiana 71201

Dear Board Members:

The State Legislature requested that the school boards of the Monroe City School System and the Ouachita Parish School System meet to discuss any mutual problems they might have and report to the Legislature before its next meeting. The central question in the minds of some legislators, as we understand it, was, "Should the two school systems of Monroe and Ouachita Parish be consolidated?" The President of the Monroe City School Board wrote to the President of the Ouachita Parish School Board proposing that a joint meeting be held by committees from both boards as requested by members of our Legislature.

Subsequently, a joint meeting was held and in answer to the major question, "Do you want the two school systems consolidated?" the answer was a unanimous "No".

Our report could end here as far as the Legislature is concerned, but we might add that our Superintendents have met since the joint board committee meeting and discussed other matters which might be of concern to both systems.

The Parish Board has suggested that the Monroe Board pay the Ouachita Board fifty dollars per pupil per year for every Monroe child attending a Parish school and vice versa in the case of a Parish child attending a City School. We cannot agree to this since a student attends a school of his own volition, and Ouachita Parish operates a busing system over every section of the City of Monroe, whereas the City School Board does not operate a busing system outside the city limits and has no desire to do so in order to try to bring parish children into the City Schools. We would agree to this proposal only on condition that both school boards mutually agreed in advance for a pupil to enroll in a school of the other

system. To do otherwise would create many problems. For example, if a pupil from Lincoln Parish decided he wanted to attend a school in Jackson Parish, just of his own choosing, no one could expect Lincoln Parish to reimburse Jackson Parish for this child's education. Practiced all over the state, such transferring could be chaotic. The Monroe City School Board, therefore, recommends that students living in Monroe be required to attend Monroe City Schools, if they attend a public school, and that pupils living outside the Monroe City limits in Ouachita Parish be required to attend a public school. Exceptions to this agreement could only be made by mutual approval of both school boards in advance.

Another suggested proposal was that the present city limits be frozen as far as school taxes are concerned. We, the citizens of Monroe, cannot agree to this proposal. It would be very short-sighted and eventually, as the city limits are extended the revenue from property assessment would increase and the number of pupils inside the present city limits would decrease. This same action was taken in Lake Charles several years ago and eventually the Lake Charles City Schools were abolished.

On this subject, let me state that Louisiana is the only one of forty-eight states to use the strong Central Parish or County style administrative plan for its public schools. (Maybe it's just a coincidence that Louisiana ranks at the bottom of the ladder in literacy.) In all the other states cities large enough to support their own school systems do so, and in all other states city school systems and County or Parish School Systems have solved their problems of expanding city limits. In Mississippi, for instance, when the new area taken into the City limits includes a County school, the County school is taken over by the city, and the city in turn assumes all bonded indebtedness for that school. This is one possible solution Monroe and Ouachita Parish might consider. However, it is not a problem that confronts us at the present time.

Our two-school systems have had a very good relationship in the past, and we assure you we shall be happy to discuss any matters of mutual interest at any time satisfactory to you.

Very truly yours,

_____

Paul J. Neal, President
Monroe City School Board

_____

Henry Carroll, Vice President
Monroe City School Board

_____

Mickey Yerger, Member
Monroe City School Board

cc: Honorable K. D. Kilpatrick
    Honorable E. L. "Bubba" Henry
    Honorable John Ensminger
    Honorable William D. Brown
    Honorable T. W. Humphries
    Honorable Shady Wall
    Honorable Lawrence Gibbs
    J. O. Lancaster, Jr.

## APPENDIX VIII

### COLUMN I

1977-78 Enrollment for the Monroe City School System:

| School | Black | White | Total |
|--------|-------|-------|-------|
| Barkdull Faulk | 149 | 118 | 267 |
| Berg Jones | 786 | 5 | 791 |
| Carver | 422 | 12 | 434 |
| Clara Hall | 138 | 173 | 311 |
| Clark | 685 | 0 | 685 |
| Georgia Tucker | 55 | 248 | 303 |
| Levington | 181 | 277 | 458 |
| Lida Benton | 99 | 157 | 256 |
| Lincoln | 658 | 0 | 658 |
| Minnie Ruffin | 165 | 117 | 282 |
| Sallie Humble | 164 | 323 | 487 |
| Sherrouse | 330 | 73 | 403 |
| Carroll Junior | 333 | 93 | 426 |
| Jefferson | 503 | 141 | 644 |
| Lee | 308 | 96 | 404 |
| Carroll High | 780 | 135 | 915 |
| Neville High | 315 | 448 | 763 |
| Wossman High | 658 | 305 | 963 |
| Total: | 6729 | 2721 | 9450 |

### COLUMN II

Total Number of Students Who Would Have been Assigned by for the Interdistrict Overlap in 1977-78

| School | Black | White | Total |
|--------|-------|-------|-------|
| Barkdull Faulk | 169 | 133 | 302 |
| Berg Jones | 1045 | 27 | 1072 |
| Carver | 422 | 46 | 468 |
| Clara Hall | 151 | 271 | 422 |
| Clark | 742 | 4 | 746 |
| Georgia Tucker | 56 | 265 | 321 |
| Levington | 183 | 289 | 472 |
| Lida Benton | 107 | 163 | 270 |
| Lincoln | 739 | 4 | 743 |
| Minnie Ruffin | 178 | 299 | 477 |
| Sallie Humble | 168 | 339 | 507 |
| Sherrouse | 329 | 187 | 516 |
| Carroll Junior | 354 | 132 | 486 |
| Jefferson | 575 | 294 | 869 |
| Lee | 332 | 129 | 461 |
| Carroll High | 799 | 186 | 985 |
| Neville High | 332 | 521 | 853 |
| Wossman High | 821 | 440 | 1261 |
| Total: | 7502 | 3729 | 11231 |

### COLUMN III

Total Number of Students Who Would Have Been Assigned but for the Interdistrict Overlap in 1978-79

| School | Black | White | Total |
|--------|-------|-------|-------|
| Barkdull Faulk | 180 | 129 | 309 |
| Berg Jones | 1081 | 23 | 1104 |
| Carver | 446 | 15 | 461 |
| Clara Hall | 186 | 278 | 464 |
| Clark | 723 | 7 | 730 |
| Georgia Tucker | 28 | 281 | 309 |
| Levington | 157 | 305 | 462 |
| Lida Benton | 141 | 185 | 326 |
| Lincoln | 696 | 1 | 697 |
| Minnie Ruffin | 199 | 220 | 419 |
| Sallie Humble | 145 | 338 | 483 |
| Sherrouse | 355 | 210 | 565 |
| Carroll Junior | 411 | 127 | 538 |
| Jefferson | 644 | 238 | 882 |
| Lee | 284 | 149 | 433 |
| Carroll High | 756 | 157 | 913 |
| Neville High | 303 | 445 | 748 |
| Wossman High | 854 | 358 | 1212 |
| Total: | 7589 | 3466 | 5774 |

GX 52, PX 4

## ORDER

For the reasons assigned in the foregoing Ruling,

IT IS ORDERED that the overlapping student attendance zones between the Monroe City School System and the Ouachita Parish School System be abolished. A student residing within the corporate limits of the City of Monroe can attend only the City school serving his zone of residence. A student residing outside the corporate limits of the City of Monroe, but inside Ouachita Parish, can attend only the Parish school serving his zone of residence. The freeze order and concomitant option incorporated in previous decrees of this court are abolished.

IT IS FURTHER ORDERED that the Ouachita Parish School Board and the Monroe City School Board form a committee to insure a smooth transition during the separation of the two school systems' overlapping student attendance zones.

IT IS FURTHER ORDERED that the MCSS devise a new desegregation plan incorporating the two phases outlined in this court's Ruling. The City shall submit a preliminary report to the court by the close of business on Wednesday, July 30, 1980. In this report, the City shall inform the court of the progress made in devising a new desegregation plan for MCSS. As indicated in this court's ruling, no student assignment plan shall become effective until the 1981–82 school year; however, the City may take immediate steps to abolish the multiple school changes currently experienced by its junior high-high school students.

IT IS FURTHER ORDERED that a Special Master be appointed to assist this court in devising a desegregation plan for the MCSS and in insuring a smooth transition in a separation of the two systems' overlapping student attendance zones.